Ray HUBER, Edward L. Rees, Carl C. Huber, and James Bono as Trustees of the UFCW, Local 23 and Giant Eagle Pension Fund, Appellants at 89–3776, Cross–Appellees at 89–3780,

v.

CASABLANCA INDUSTRIES, INC., Cross–Appellants at 89–3780, Appellees at 89–3776.

Nos. 89–3776, 89–3780.

United States Court of Appeals, Third Circuit.

Argued June 21, 1990.

Decided Sept. 24, 1990.

Rehearing and Rehearing In Banc Denied Oct. 22, 1990.

William P. Getty (argued), Joseph A. Vater, Jr., Meyer, Unkovick & Scott, Pittsburgh, Pa., for appellants-cross-appellees.

E. Calvin Golumbic (argued), Ronald L. Castle, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C., for appellees-cross-appellants.

Carol Connor Flowe, Gen. Counsel, Jeanne K. Beck, Deputy Gen. Counsel, Israel Goldowitz, Asst. Gen. Counsel, Steven A. Weiss, Atty. (argued), Office of the Gen. Counsel, Washington, D.C., for amicus curiae Pension Ben. Guar. Corp.

K. Peter Schmidt, Douglas L. Wald, Arnold & Porter, Washington, D.C., for amicus curiae Nat. Coordinating Committee for Multiemployer Plans.

Before STAPLETON and GREENBERG, Circuit Judges, and POLLAK, District Judge *.

* The Honorable Louis H. Pollak, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

## OPINION OF THE COURT

GREENBERG, Circuit Judge.

This case raises a number of questions regarding the calculation of withdrawal liability under the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. § 1381 *et seq.*:

1) How is an investment contract to be valued?

2) How is the interest rate on amortization of withdrawal liability selected when the most recent actuarial valuation of the plan uses more than one interest rate?

3) What, if any, interest is to be assessed on the withdrawal liability for the period between the calculation date and the start of payments?

4) If, after arbitration, it is ascertained that the interim liability payments exceed the employer's total withdrawal liability, may the employer be paid interest on the overpayment?

5) May lump-sum post-retirement death benefits be included in the calculation of vested benefits?

6) Can informal written amendments to a plan be effective?

7) Can a fund make a second assessment of withdrawal liability?

We conclude that assets must be valued consistently with liabilities; that if there is more than one interest rate used in the most recent actuarial valuation, that rate which was used to value vested liabilities should be used for MPPAA amortization; that one year of presumed pre-demand interest is included in the amortization schedule; that interest should be paid on overpayments of withdrawal liability; that lump-sum death benefits may not be included when calculating MPPAA unfunded vested benefits; that informal written amendments to a plan may be effective if made pursuant to the plan's amendment procedure; and that the validity of the second assessment will be determined in arbitration.

## FACTS AND PRIOR PROCEEDINGS

The United Food and Commercial Workers, Local 23–Giant Eagle Pension Fund (the "Fund") is a multi-employer pension plan covered by the withdrawal liability provisions of the MPPAA. The Fund was created in 1957 in collective bargaining involving Thorofare Markets, Inc.[1] (the "Employer"), Local 1407, Retail Clerks International Association (which later became part of Local 23 of the UFCW) and Giant Eagle Markets, Inc. The only contributing employers to the Fund have been Thorofare, Giant Eagle, and the local union on behalf of some of its own employees. *Casablanca Industries, Inc. and UFCW Local 23–Giant Eagle Pension Fund,* 7 EBC 2705, 2707 (1986) (Arbitrator's first opinion). On April 6, 1982, Thorofare withdrew from the Fund. Despite the requirement of 29 U.S.C. § 1399(b)(1) that a demand for withdrawal liability must be issued by a multiemployer plan "[a]s soon as practicable" after an employer's withdrawal, no demand letter was issued to the Employer until November 28, 1984—more than two and one half years after the withdrawal. App. at 1931. This delay seems to have been due to the Fund's poor records, *see* 7 EBC at 2710, and its inability to obtain adequate records from the Vector Group, its outside administrators.[2]

The Employer disputed the amount of the demand and, as it invoked arbitration under 29 U.S.C. § 1401(a), an impartial Arbitrator, Ira F. Jaffe, Esq., was selected. Arbitration hearings were held on 11 days from December 4, 1985, until April 15, 1986, and the Arbitrator issued an Opinion and Award on December 13, 1986.

---

1. Casablanca Industries, Inc., Appellee and Cross–Appellant in this case, is the parent company of Thorofare, and the parties stipulated that Casablanca was responsible for any withdrawal liability which was properly assessed as a result of Thorofare's withdrawal from the Fund.

2. Vector has apparently since gone into bankruptcy. A proof of claim was filed by the Fund against the Vector group for the cost of organizing the Fund's data, as well as the loss of pre-demand interest on the withdrawal liability of the Employer. *See* App. at 1328–29.

That Opinion and Award directed the Fund to recompute certain figures, resulting in a substantial reduction of the Employer's liability, and provided for the Arbitrator to retain jurisdiction for review of that recomputation. In the recomputation, the Fund included calculations for liabilities based on data not provided at the initial hearing. The Employer moved to strike this new information, and the Arbitrator issued an Opinion on August 27, 1987, granting that motion. *See* App. at 2023–49. The Arbitrator issued a third Opinion on February 8, 1988, dealing with remaining issues, including a claim by the Employer for interest on the overpayment it had made on account of the demand initially made by the Fund. On March 21, 1988, the Arbitrator issued a Final Order setting the withdrawal liability of the Employer to the Fund, and the amount of the overpayment which must be returned by the Fund to the Employer.

This action was originated in the district court while the arbitration was still pending, as the Fund filed a complaint on January 12, 1987, challenging the portions of the first Opinion and Award of the Arbitrator unfavorable to the Fund. The action was, however, stayed pending the resolution of the remaining issues by the Arbitrator. Subsequently, an amended complaint and a supplemental complaint were filed and, in addition, the Employer counterclaimed seeking to invalidate portions of the award unfavorable to it, as well as the second assessment. The district court decided the case on cross-motions for summary judgment in an opinion dated October 30, 1989, and the appeal and cross-appeal have been taken from the accompanying order.[3]

## STANDARD OF REVIEW

■ It is clear that, in a MPPAA arbitration, the Arbitrator's factual findings are presumed to be correct and are "rebuttable only by a clear preponderance of the evidence." 29 U.S.C. § 1401(c); *United Retail & Wholesale Employees v. Yahn & McDonnell, Inc.*, 787 F.2d 128, 135 n. 9 (3d Cir.1986), *aff'd per curiam by an equally divided court sub nom. Pension Benefit Guarantee Corp. v. Yahn & McDonnell*, 481 U.S. 735, 107 S.Ct. 2171, 95 L.Ed.2d 692 (1987) (*"Yahn & McDonnell"*). The statute does not prescribe the standard of review for legal conclusions of the Arbitrator but the parties, including the *amicus curiae* Pension Benefit Guarantee Corporation ("PBGC"), and the district court agree that the legal conclusions of the Arbitrator must be reviewed *de novo*, and we concur.[4]

3. The district court had jurisdiction under 29 U.S.C. §§ 1401(b)(2) and 1451. The parties timely appealed from the order entered on the summary judgment and this court has jurisdiction pursuant to 28 U.S.C. § 1291.

4. There is dictum in *Yahn & McDonnell* that can be read to suggest that legal conclusions of an MPPAA arbitrator must also be given deference:

We note that § 1401(c) requires the district court to presume the arbitrator's findings of fact correct, and makes no mention of the scope of review of the arbitrator's legal determinations. In light of this court's settled policy of extreme deference to an arbitrator's legal as well as factual determinations, *see, e.g., United Steelworkers of America, District 36 v. Adbill Management Corp.*, 754 F.2d 138 (3d Cir.1985), we do not read this omission as suggesting that the district court has plenary review over the arbitrator's findings of law. 787 F.2d at 135 n. 9.

*Yahn & McDonnell* involved a constitutional challenge to the portion of the MPPAA providing that in an arbitration of a dispute over a withdrawing employer's liability, the plan trustees' determination "is presumed correct unless the party contesting the determination shows by a preponderance of the evidence that the determination was unreasonable or clearly erroneous." 29 U.S.C. § 1401(a)(3)(A). The case had not yet gone to arbitration, and the issue was whether the deference given to the arbitrator would "perpetuate the insulation of the trustees' putatively biased determination from effective review." 787 F.2d at 135 n. 9.

We regard the footnote as dictum, as a *de novo* review by the court of the arbitrator's legal determinations would not have cured the infirmity we found in the statute. In *Trustees of Iron Workers Local 473 Pension Trust v. Allied Products Corp.*, 872 F.2d 208, 211–12 (7th Cir.), *cert. denied,* — U.S. ——, 110 S.Ct. 143, 107 L.Ed.2d 102 (1989), the court noted that *Adbill*, upon which *Yahn & McDonnell* had relied on this point, was distinguishable. In *Adbill*, the arbitration was carried out pursuant to a collective bargaining agreement. As the Supreme Court has noted, "[t]he function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator ... the moving party should

Of course, our review of the order of the district court is plenary.

## DISCUSSION

### I. There is no "Clear Preponderance of the Evidence" to Rebut the Arbitrator's Valuation of the Fund's Assets.

The Fund's calculation of the unfunded vested benefits was based on an asset valuation of $9,829,599. 7 EBC at 2711. The Arbitrator found that this did not represent the "best estimates" of the actuary, Mr. Halliwell, but "had its genesis in the Board of Trustees ... and had as an objective the intention of inflating the withdrawal liability payments assessed against the Employer...." 7 EBC at 2724. The Arbitrator concluded that the assets of the fund as of the calculation date[5] were $14,280,901. See 7 EBC at 2726. The district court upheld this finding on the basis of the MPPAA's presumption in favor of the Arbitrator's findings of fact.

The key dispute is over the valuation of two long-term investment contracts made by the Fund with the Great West Life Assurance Company. The Trustees sought to value these at $5,677,616, their value if liquidated as of the calculation date, while the Arbitrator valued them at $10,111,474, their "guaranteed contract" or book value.[6] As described by the Arbitrator:

> The long-term investment contracts held deposits of the Fund in calendar year funds which matured over a 15 year period and which retained a fixed interest rate during that period. Each year, 6 2–3% (i.e., one-fifteenth) of the initial principal amount plus the interest earned during that year would be released into a short-term fund which the Fund could then either deposit into the next calendar year fund as part of the initial principal for that calendar year fund, maintain under the terms of short term investment contract (from which withdrawals could be made without penalty), or withdraw the sum without penalty for investment in some other asset or for use in paying benefits. Thus, absent the premature cancellation of the long-term investment contract, it would take the Fund a total of 15 years after the last deposit to recover all of the funds held on deposit under that contract by Great West.

7 EBC at 2712–13.

The process of withdrawing the funds in the long-term contracts without reinvestment is referred to as "rolling out." As one alternative to "rolling out" the contracts, the Trustees could immediately cash out the contracts before their scheduled maturity, but if they did so would only receive the "current capital value." The current capital value took account of the difference between the contract interest rates—which ranged from 8.7% to 12.25%, see 7 EBC at 2713—and the current, or "new money" interest rate, which, as of the calculation date, September 30, 1981, was 15.25%. See 7 EBC at 2714. The contractual formula used to determine the current capital value magnified the economic loss

not be deprived of the arbitrator's judgment, when it was his judgment and all that it connotes that was bargained for." *United Steelworkers of America v. American Manufacturing Co.*, 363 U.S. 564, 567–68, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960). In MPPAA cases, however, the parties do not bargain for arbitration as it is imposed by statute. Accordingly, we think that the deference due the arbitrator requires nothing more than respect for his views, as the court might benefit from the arbitrator's expertise. *See Crown Cork & Seal Co. v. Central States etc. Pension Fund*, 881 F.2d 11, 19 (3d Cir.1989). A contrary ruling could result in a court upholding plausible arbitration awards reaching different legal conclusions. For example, reasonable people could differ on whether an employer making overpayments in response to a demand letter should receive interest with the refund. Indeed, that has happened here, as we disagree with the district court on the point. Surely such a decision should not vary from case to case, depending upon the personal outlook of the arbitrator.

5. The last day of the last plan year preceding the plan year in which the withdrawal occurs, *see* 29 U.S.C. § 1391. In this case, that date is September 30, 1981. *See* 7 EBC at 2708.

6. There were $3,534,189 in investments that were not subject to liquidation penalty, as well as $634,238 in net miscellaneous assets. *See* 7 EBC at 2713. This leaves a $17,443 discrepancy in the Fund's figures, which has not been explained.

resulting from the difference in rates, in the sense that there was a penalty provided for cashing out which reduced the recovery on the contracts to an amount below that which would have been produced by computations predicated solely on interest rate differentials. As we conceive it, the situation seems to be similar to that occasioned by the premature cashing of a certificate of deposit with a penalty for early withdrawal.[7] The Arbitrator found that in order to have cashing out make economic sense, the Fund would need to find an investment with a guaranteed long-term return of 20%, an impossible task. *See* 7 EBC at 2714. Valuing the approximately $10.1 million in fund assets subject to the penalty at the "Current Capital Value" would represent a paper loss of over $4.4 million, a "distress" valuation. *Id.*

The Arbitrator found that the Fund had no need to sell assets at distress, *see* 7 EBC at 2714, a finding supported by the testimony of trustee Raymond Huber,[8] *see* App. at 714. In addition to the cash flow from Giant Eagle's normal contributions, there were more than $3.5 million in investments that could be liquidated without penalty. *See* 7 EBC at 2713. The Arbitrator concluded that "the Fund is seeking [to] collect a windfall from the Employer based upon an unreasonable discounting of those investment contracts...." 7 EBC at 2719.

The Arbitrator found that if the stream of payments from the funds were discounted at 8%, the rate used to discount the liabilities of the Fund, the present value would be 107% of the book value. If the stream of payments were discounted at 10.75%, one-half percentage point above the PBGC immediate annuity rate of 10.25% in effect on September 30, 1981, the present value would be 97% of the book value. He therefore concluded that the "guaranteed contract" or book value was a reasonable measure of the value of the contracts. 7 EBC at 2718, 2724–25.

The Fund argues that the Arbitrator's use of a stream-of-payments valuation was unreasonable because the Trustees might have been able to invest the proceeds of a cash-out of the contract funds at higher rates of return than the funds were paying. In support of this argument, it points to the high appreciation of the Dow Jones Industrial Average. *See* Fund's Brief at 16. It suggests that the Arbitrator's approach "ignore[s] [the trustees'] fiduciary obligation to make an annual decision with respect to each rollout; namely, whether it was best to take the rollout and invest it elsewhere, or to reinvest it under the contract...." *See id.* at 17–18. This argument is supported by the recent decision of

---

7. For instance, for the 1977 calendar year fund, the contract interest rate was 8.7%, *see* App. at 1937, which was 6.55 percentage points less than the new money interest rate of 15.25%. The fund was in its fourth year (1981–1977) so the multiplier was 7.7. *See* App. at 1044. The "Current Capital Multiplier" for 1981 is there-

fore derived from the formula 1—(6.55% * 7.7) = 0.49565. *See* 7 EBC at 2713. However, even assuming a market interest rate of 15.25%, the multiplier that the market would assign to the fund would be 0.77276. This can be derived from the formula

$$\sum_{Y=1}^{\text{Years Remaining}} \frac{\text{Contract Interest for Year } Y + \text{Return of Principal for Year } Y}{(1 + \text{Market Interest Rate})^Y}$$

The Fund can be viewed as a series of bonds, with payments due 1, 2, 3 ... 10, and 11 years in the future. The present value of a payment to be made $Y$ years in the future is

$$\frac{\text{Payment}}{(1 + \text{Market Interest Rate})^Y}$$

The payment each year is the sum of the contract interest and the return of principal. The contract interest for any year is the contract interest rate times the remaining principal. The 1977 fund had 11 years to run, and an equal portion of the principal was to be returned each year.

8. Huber is an employer representative of Giant Eagle, and has been a trustee since January of 1981. *See* App. at 611–12.

the Court of Appeals for the Fourth Circuit in *Masters, Mates & Pilots Pension Plan v. USX Corp.*, 900 F.2d 727, 734 (4th Cir. 1990) ("The current level of the risk-free rate might be relevant in determining what range of interest rates will likely be earned within a certain time frame; but its existence cannot be considered a floor for valuing benefits, or else, pension plans would be forced to invest in only government securities since they could not chance holding a riskier portfolio and producing less than the riskless rate of return.")

That analysis confuses the question of what the Fund may invest in with the prediction of the Fund's rate of return. The Trustees may well consider other investments, either as payments are rolled out, or indeed through the "distress" cashing out. It is also possible that riskier investments may *in retrospect* result in a lower rate of return. However, it must be assumed that the Trustees will only make investments for which, at the time of the investment, the *expected* rate of return, after accounting for transaction costs, is equal to or better than the contract. To do otherwise would be to ignore their fiduciary duty. *See* RESTATEMENT (2D) of TRUSTS § 227(a) (1959) (trustee must "make such investments and only such investments as a prudent man would make of his own property"), *id.* at comment e ("No man of intelligence would make a disposition of property where in view of the price the risk of loss is out of proportion to the opportunity for gain.")[9]

We agree with the analysis of the district court in *Jerome Mirza & Assoc., Ltd. v. United States*, 692 F.Supp. 918 (C.D.Ill. 1988), *aff'd*, 882 F.2d 229 (7th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 2166, 109 L.Ed.2d 496 (1990). In that case, the court rejected as unreasonable a 5% as-

sumption of the rate of return for a pension plan. The court noted that the plan could obtain a guaranteed return of over 12% by investing in U.S. Treasury Bonds, and concluded that "the only reason a prudent investor would not buy them would be due to a belief that they could get a higher yield with other investments." *Id.* at 923. The fact is that there was simply no reason to cash out here and thus cause the Fund a substantial loss. The investments with Great West were not transferable and cannot reasonably be considered the equivalent of investments with a recognized market value subject to liquidation at a value established in an open market. Rather, the current capital value received upon their liquidation was governed by the contracts themselves, which, though taking into account current interest rates, magnified the loss upon liquidation.[10] Accordingly, we cannot conclude that the Arbitrator was unreasonable in his conclusion.

The Fund also contends that "the arbitrator's mandated asset valuation is unreasonable and clearly erroneous when used in combination with an 8% assumption to discount liabilities." Fund's Brief at 20. The Fund suggests that the use of an 8% discount rate for liabilities is very generous because "many multiemployer funds have used discounting factors well below 8%," Fund's Brief at 21. The Fund suggests that by increasing the valuation of the assets, the Arbitrator destroyed a balance established by the actuary.

The statute requires that "withdrawal liability ... be determined ... on the basis of actuarial assumptions ... which, *in the aggregate*, are reasonable ... and which *in combination*, offer the actuary's best estimate of anticipated experience under the

---

**9.** For example, if a trustee has $100 invested risk-free at 10% for a year, with no penalty for early withdrawal, he is free to "cash out" of this investment in favor of one which, at the time of the decision, has a 50% chance of returning 30% and a 50% chance of returning 0% income. The expected value of the first investment at the end of the year is $110, while that of the second is $115. Arguably he would violate his fiduciary

duty if the second investment had only a 20% chance of returning 30%, since the expected value would then only be $106, which is less than $110.

**10.** We are not confronted with and thus do not decide the question of how to value assets that are not subject to such a penalty.

plan." 29 U.S.C. § 1393(a)(1).[11] This language means, *inter alia,* that assumptions used to discount assets must be consistent with those used to discount liabilities. Aside from reasonable adjustments for risk, a dollar of projected income has the same value as a dollar of pension payment to be made at the same point in time. Accordingly, the relevant comparison is not between the discount rate used in this valuation and that used in other reported cases, but between *this* plan's discount rate for liabilities and *this* plan's discount rate for assets. Since the assets for this plan were earning interest at rates ranging from a minimum of 8.7% to 17%, the use of an 8% discount rate for the liabilities does not seem unreasonably generous to the Employer.

■ The Fund also contends that the Arbitrator should have presumed that the demand figures represented the actuary's "best estimate," pursuant to section 1401(a)(3)(B). They point out that *Yahn & McDonnell* involved the bias of a plan's sponsor, not the plan's actuary. *See* Fund's Brief at 11 & n. 2.

However, the rationale of *Yahn & McDonnell*—trustee bias in favor of the fund—carries over to an actuary selected and paid by the trustees. As Alexander Hamilton noted in explaining the Compensation Clause of Article III in The Federalist No. 79, "a power over a man's subsistence amounts to a power over his will." *See also United States v. Will,* 449 U.S. 200, 217–19, 101 S.Ct. 471, 482, 66 L.Ed.2d 392 (1980).

The principle was magnificently demonstrated in this case. On July 31, 1984, the actuary, Halliwell, submitted a report to the trustees valuing the assets of the Fund at the guaranteed contract value of $14 million. *See* App. at 1830–31. On August 8, 1984, the minutes of a Board of Trustees meeting reveal that:

> The Board expressed its concern over Mr. Halliwell's method of calculating withdrawal liability ... The Board expressed lack of confidence in the calcula-

tions and Mr. Halliwell's advice. The Board agreed that it should consider other actuaries at the next Board of Trustees meeting, to provide services to the Fund including a final calculation of withdrawal liability in accordance with the statute.

App. at 1834.

Within a few days, both Halliwell's advice and the Board's opinion of him had changed. On August 29, 1984, the Board's minutes reveal that

> Ray Huber asked whether a demand for withdrawal liability could be sent at this time. Mr. Halliwell responded by stating he could complete a final calculation of withdrawal liability within five days *upon receiving guidance from the Board on outstanding issues.* ... Ray Huber made a motion, which was seconded by Mr. Rees, that the Board of Trustees continued to retain Halliwell & Co. and that Mr. Halliwell be requested to calculate Thorofare's withdrawal liability *based on assumptions which he could support that were in the best interests of the Fund.*

App. at 1835–36 (emphasis added).

Accordingly, even if we were inclined to distinguish the holding of *Yahn & McDonnell* as a case involving bias of a board of trustees rather than an actuary, this would not be an appropriate case in which to do so. We thus will affirm the district court on the valuation issue.

## II. Interest Rate to be used for Amortization of Withdrawal Liability Payments.

■ Once the Employer's share of the unfunded vested benefits has been ascertained, the amortization schedule must be determined. The factors to be determined are:

1) the amount of each payment

2) the frequency of the payments

3) the interest rate to be applied.

Based upon these factors, the number of payments is mechanically calculated.

---

**11.** Section 1393(a)(2) provides that, as an alternative, the actuary may use assumptions provided for in PBGC regulations. However, no such regulations have been promulgated.

Item (1), the amount of each payment, is based on the Employer's contribution history over the past 10 years and is not in dispute here. *See generally*, 29 U.S.C. § 1399(c)(1)(C). The statute requires that the schedule be calculated as if the payments were annual. 29 U.S.C. § 1399(c)(1)(A)(i). However, the parties disagree over item (3), the interest rate to be used for this amortization schedule.

The statute requires that the determination of the amortization period for the Employer's withdrawal liability payments "shall be based on the assumptions used for the most recent actuarial valuation for the plan." 29 U.S.C. § 1399(c)(1)(A)(ii). An actuarial valuation is required every three years, and must contain "a description of the funding method and actuarial assumptions used to determine costs under the plan," 26 U.S.C. § 6059(b)(1) and "a certification of the contribution necessary to reduce the accumulated funding deficiency to zero," [12] 26 U.S.C. § 6059(b). At the time of the demand in this case, the most recent actuarial valuation had been performed as of October 1, 1980. If that valuation had used only one interest rate, then that would have been the appropriate interest rate. However, the Fund's actuarial valuation used two interest rates: 6.25% for the payments required to fund fully the plan as defined under 26 U.S.C. § 412, and 8.0% to value vested benefits. *See* App. at 1462.

The Fund determined that the 8% vested benefit valuation rate was appropriate for the amortization of the withdrawal liability. The Employer contended that the section 412 rate of 6.25% should have been used. The Arbitrator agreed with the Employer, reasoning that since withdrawal liability payments were meant to substitute for the lost stream of contributions which the employer would have otherwise provided, and since the normal contributions made by the employer prior to withdrawal are based on the section 412 rate,

[i]t is logical to infer, therefore, that Congress, which desired specificity in the interest used by the Fund to calculate the duration of the withdrawal liability payment schedule, would have required that the interest rate used to value future contributions to the Fund be applied to the future stream of withdrawal liability payments which the fund was to receive.

7 EBC at 2729–30.

Thus, the Arbitrator did not find that the 6.25% rate was more appropriate based on the characteristics of this plan, a finding that would have been entitled to deference. Rather, the Arbitrator's decision on this issue was based on statutory interpretation, an area in which deference is not due.

The district court reversed the Arbitrator, since it "[found] nothing in the statute which requires the Fund to use the § 412 assumptions." App. at 2093. The PBGC agrees with the district court because "nothing in 29 U.S.C. § 1399(c)(1)(A)(ii) requires a plan to use the IRC § 412 rate." Brief of *amicus* PBGC at 38. The PBGC noted that "if Congress had intended to require a plan to use the [§ 412] funded rate, it knew how to say so," citing section 1393(b)(1) which refers to "the most recent complete actuarial valuation used for purposes of section 412 of Title 26...." We are persuaded by this reasoning.

The PBGC also notes that

[s]ome plans use one rate, the so-called Section 412 rate, to calculate their statutory minimum funding requirements, and another rate to value unfunded vested benefits. This practice can be explained because vested benefit liabilities are payable over a shorter time horizon than total accrued liabilities. Therefore, the actuary need not be as conservative in his choice of an interest rate assumption for vested benefits. *See generally* Feuer, *The Selection and Arbitration of Withdrawal Liability Interest Rates*, 10

---

12. 26 U.S.C. § 412 mandates the calculation of a "funding standard account" which compares actual contributions to those required under minimum funding requirements. The "accumulated funding deficiency" is the deficit in the "funding standard account," in other words, the accumulated shortfall in minimum required contributions. *See* E. ALLEN, J. MELONE, J. ROSENBLOOM, & J. VANDERHEI, PENSION PLANNING 184–85 (6th ed. 1988).

EMPLOYEE BENEFITS JOURNAL 23 (1985).[13]

Brief of *amicus* PBGC at 37–38.

Since the withdrawal liability payments are meant to fund the accrued *vested* liabilities, as opposed to the accrued *total* liabilities, we are persuaded that it was appropriate for the Fund to select the rate used to value the vested liabilities. We therefore will affirm the district court's holding that the appropriate amortization interest rate was 8%.

III. The Language of the Statute clearly compels the imposition of First Year Interest, but not Pre–Demand Interest.

■ The unfunded vested benefits of the plan (i.e., the present value of the vested benefits less that of the assets of the plan) are calculated as of the last day of the plan year preceding that in which the employer withdraws. *See* 29 U.S.C. § 1391. They represent the amount which, if contributed *on that day*, would fully fund the plan.

The Fund assessed interest on the amount demanded for the period between October 1, 1981 (the day after the calculation date for the withdrawal liability), and December 1, 1984 (the date the first payment was due). For purposes of analysis, this interval will be separated into two periods: The period between October 1, 1981, and September 30, 1982 ("first year interest"), and the period between October 1, 1982, and December 1, 1984 ("pre-demand interest").

The section of the statute that governs this interest question is 29 U.S.C. § 1399(c)(1), which provides:

> Except as provided in subparagraphs (B)[14] and (D)[15] of this paragraph and in paragraphs (4)[16] and (5),[17] an employer shall pay the amount determined under section 1391 of this title,[18] adjusted if appropriate first under section 1389 of this title[19] and then under section 1386 of this title[20] over the number of years necessary to amortize the amount in level annual payments determined under subparagraph (C),[21] *calculated as if the first payment were made on the first day of the plan year following the plan year in which the withdrawal occurs* and as if each subsequent payment were made on the first day of each subsequent plan year. Actual payment shall commence in accordance with paragraph (2).[22] (emphasis supplied).

---

13. But Feuer himself writes that "the overwhelming majority of actuaries appear to use funding interest rates for withdrawal liability determinations." *Id.* at 27.

14. Section 1399(c)(1)(B) provides "[i]n any case in which the amortization period described in paragraph (A) exceeds 20 years, the employer's liability shall be limited to the first 20 annual payments determined under subparagraph (C)."

15. Section 1399(c)(1)(D) refers to mass withdrawals, in which the 20 year limitation of (B) does not apply.

16. Section 1399(c)(4) provides that an employer may prepay withdrawal liability without penalty.

17. Section 1399(c)(5) provides that an employer defaulting on its obligation to make any withdrawal liability payment may be required by the plan sponsor to pay the entire withdrawal liability immediately.

18. Section 1391 lists methods for computing the employer's share of the plan's unfunded vested benefits.

19. Section 1389 prescribes a de minimis rule for withdrawal liability.

20. Section 1386 provides that if an employer's withdrawal is partial, rather than complete, the withdrawal liability is proportional to the decline in contribution base units.

21. The annual payment is calculated as the product of a designated number of contribution base units (e.g., hours worked, weeks worked, tons of coal) and a contribution rate. These factors are based on the employer's history with the fund during the previous ten plan years.

22. Section 1399(c)(2) provides that

> [w]ithdrawal liability shall be payable in accordance with the schedule set forth by the plan sponsor under subsection (b)(1) of this section beginning no later than 60 days after the date of the demand notwithstanding any request for review or appeal of determinations of the amount of such liability or of the schedule.

The Arbitrator concluded that neither first year nor pre-demand interest was payable. He reasoned that the Act contained no provision requiring first year interest, and that assessment of first year interest could result in a double assessment of interest in a case where an employer withdraws early in the plan year and a fund quickly calculates and demands the withdrawal liability. *See* 7 EBC at 2728–29. The Arbitrator concluded that while equity might counsel that the Fund was entitled to pre-demand interest to compensate it for the loss of the use of the money during the period in question, the statute would not allow it. He was persuaded that the "clear Congressional statement in Section 4219(c)(3) [29 U.S.C. 1399(c)(3)] allowing the imposition of interest in cases where payments are not made when due ... impliedly precludes the assessment of pre-demand interest ... for times when the Employer was not in breach of any payment obligation." App. at 1973.

The district court concluded that interest should accrue starting from the date of the Employer's withdrawal, reasoning on the one hand that

> [t]he employer's debt to the Fund is not incurred until an actual withdrawal occurs, *International Harvester*, 681 F.Supp. at 516,[23] even if the statute provides for computation of liability on the basis of an arbitrary date ...

and on the other hand that

> Congress intended for plan participants to be protected from the loss of resources due to the passage of time; consequently we find that interest may be included as part of the employer's withdrawal liability obligation in order to counteract any erosion of the plan's re-

sources caused by delayed funding of the plan.

App. at 2091.

However, while the liability for unfunded vested benefits became accelerated on the date the employer withdrew, it did not magically appear on that date. Unfunded vested benefits are benefits which are "promised and earned but not yet funded" as of the calculation day.[24] "[T]he liability for UVBs represents a pre-existing obligation on the employer's part, and is not simply 'incurred' as of the date of withdrawal."[25] *Du Art & Technicolor v. Motion Picture Local 702 Pension Fund,* 10 EBC 1326, 1328 (S.D.N.Y.1988). In other words, the unfunded vested benefit calculation represents an employer's share of the amount needed for a fund to break even *as of the calculation date.* Due to the time value of money, that amount will grow between the calculation date and the withdrawal date.

The PBGC takes the position that MPPAA does not authorize any pre-demand interest, reasoning that MPPAA is minutely clear about issues such as the date and amount of the first payment, but indicates nothing about pre-demand interest. It contends, moreover, that

> Congress knew how to provide for interest. It clearly provided for interest in other sections of MPPAA.... In this context, the fact that Congress did not enact an equally explicit provision for the inclusion of interest accruing for any period preceding the demand as part of the withdrawal liability amount can only mean that it did not intend for the inclusion of such interest.

Brief of *amicus* PBGC at 34.

Of course, "considerable weight should be accorded" to the PBGC's "construction of a statutory scheme it is entrusted to

---

**23.** *In re Consolidated Litigation Concerning International Harvester's Disposition of Wisconsin Steel,* 681 F.Supp. 512 (N.D.Ill.1988).

**24.** *See* D. MCGINN, ACTUARIAL FUNDAMENTALS OF MULTI–EMPLOYER PENSION PLANS 54 [*quoted in Du Art & Technicolor and Motion Picture Local 702 Pension Fund,* 10 EBC 1317 (1987) (O'Loughlin, Arb.) *affirmed on this*

point, remanded on other grounds sub nom. *Du Art Film Laboratories v. Motion Picture Local 702 Pension Fund,* 10 EBC 1326 (S.D.N.Y.1988).]

**25.** Indeed, if the employer had not pulled out, it would have been compelled to pay its share of the shortfall out over time through its annual funding contributions. *See* 26 U.S.C. § 412.

administer." *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). But the PBGC interpretation does not give effect to the provision of 29 U.S.C. § 1399(c)(1) that the withdrawal liability must be calculated "in level annual payments ... as if the first payment were made on the first day of the plan year *following* the plan year in which the withdrawal occurs *and* as if each subsequent payment were made on the first day of each subsequent plan year." By denying all interest, the PBGC would calculate the liability as if the first payment were made on the first day of the plan year *of* withdrawal.

"In construing a statute we are obliged to give effect, if possible, to every word Congress used." *United States v. DiSantillo,* 615 F.2d 128, 135 (3d Cir.1980). *See also Mountain States Tel. & Tel. v. Pueblo of Santa Ana,* 472 U.S. 237, 105 S.Ct. 2587, 2594, 86 L.Ed.2d 168 (1985) (" 'elementary canon of statutory construction that a statute should be interpreted so as not to render one part inoperative' "); 2A Sutherland, Statutory Construction § 46.06 (4th ed. 1984).

> The PBGC responds that
> [d]espite considerable examination of this provision by those who are expert in MPPAA, there is no clear answer as to what Congress intended by this language. The most likely meaning is that additional interest does not accrue on an annual payment simply because each annual payment is divided into quarterly payments.

Brief of *amicus* PBGC at 36 n. 13.

The problem with this "most likely meaning" is that it renders superfluous the "first day of the plan year following" language. The meaning which the PBGC as-

cribes could have easily been stated "as if the payments were made annually." [26]

We acknowledge that when interpreting ERISA, "the Court of Appeals should consider the views of the PBGC and the IRS. For a court to attempt to answer these questions without the views of the agencies responsible for enforcing ERISA, would be to 'embar[k] on a voyage without a compass.' " *Mead Corp. v. Tilley,* 490 U.S. 714, 109 S.Ct. 2156, 2164, 104 L.Ed.2d 796 (1989). The PBGC has submitted an extraordinarily clear and helpful *amicus* brief in this case, "a sextant, enabling us to navigate our journey into uncharted, treacherous seas," *Masters, Mates & Pilots,* 900 F.2d at 732 n. 4, but has confessed that "despite considerable examination" of the statutory language in question, it has been unable to ascertain what Congress intended. When one is caught on the high seas with a broken compass, one must navigate by the stars, in this case canons of statutory construction.

The calculation mandated by 29 U.S.C. § 1399(c)(1)(A) seems certain, even if understanding it requires some effort:

1) The date of the first payment is the first day of the plan year *after* withdrawal.

2) The payments are presumed to be annual.

3) The annual payment is determined by section 1399(c)(1)(C).

4) The interest rate is "based on the assumptions used for the most recent actuarial valuation for the plan," *see* 29 U.S.C. § 1399(c)(1)(A)(ii).

5) The principal amount is the Employer's share of the unfunded vested benefits as of the *last* day of the plan year

---

**26.** Nothing here conflicts with the Supreme Court's recent decision in *Pension Benefit Guaranty Corp. v. LTV Corp.,* — U.S. —, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990). There, the court of appeals held that a decision of the PBGC restoring a terminated plan under 29 U.S.C. § 1347 because of abuse by LTV was "arbitrary and capricious" because it did not take into account the policies of laws other than ERISA. The Supreme Court found, *inter alia,* that the

court of appeals' approach was contrary to the plain language of the statute. *Id.* 110 S.Ct. at 2675–76. The Court also rejected the court of appeals' construction of section 1347 as prohibiting the PBGC's actions. However, that section, by its language, gives the PBGC discretion: "Whenever the corporation determines ... as a result of such circumstances as the corporation determines to be relevant...." By contrast, the language at issue here is mandatory.

preceding the year of withdrawal.[27]

In rejecting the Fund's claim for first year interest, the Arbitrator suggests that "the 'calculated as if' language ... appears directed to the issue of whether the payment schedule should be constructed on the basis of an immediate annuity concept [28] or a deferred annuity concept (also known as an annuity-due)." [29] 7 EBC at 2728. He did not, however, take this analysis to its logical conclusion.

All other factors being equal, the amortization period for an annuity-due will be shorter than that of an immediate annuity because the first payment of an annuity-due is made at the beginning of the interval, and is therefore applied entirely to principal—no interest has yet accrued. On the other hand, a significant portion of the first payment of an immediate annuity is applied to interest—the interest on the principal for the first interval.[30]

It is clear that in the MPPAA context we are dealing with an immediate annuity. The interval is one year, and the first payment is presumed to be due at the *end* of the first year. If Congress meant to have an annuity due, there did not have to be any presumed first payment date. The only way to construe a calculation date at the beginning of one year, and a first payment date at the beginning of the next, is as an immediate annuity.

Much is made over 29 U.S.C. § 1399(c)(4) which provides:

> The employer shall be entitled to prepay the outstanding amount of the unpaid annual withdrawal liability payments determined under paragraph (1)(c), plus accrued interest, *if any*, in full or in part, *without penalty.* (emphasis supplied).

The PBGC suggests that

[i]f pre-demand interest were permitted, the words 'if any' would be meaningless,

---

27. Contrary to the Fund's initial demand, *see* App. at 1933, first year interest is paid as part of the amortization schedule, not paid off in a lump sum.

28. In an immediate annuity, payments are due at the *end* of the payment intervals. *See* N. BOWERS, H. GERBER, J. HICKMAN, D. JONES, & C. NESBITT, ACTUARIAL MATHEMATICS 119 (The Society of Actuaries 1986).

29. In an annuity-due, payments are due at the beginning of the payment interval. *Id.*

30. There is an example in the legislative history of MPPAA that provides support for this position, but we do not rely on this support since it is so weak as to be meaningless. The Committee Report provides:

> For example, assume that an employer's withdrawal liability is $1 million and that the plan's valuation rate of interest is 6 percent. Assume that in the 3 consecutive years for which the contribution base units were the highest during the 10 most recent plan years during which the employer was obligated to contribute to the plan, the number of such units were 80,000 hours, 85,000 hours and 90,000 respectively, and that during the last ten plan years the highest contribution applicable to the employer under the plan was 75 cents an hour. The product of 85,000 hours (the average of 80,000, 85,000, and 90,000) and 75 cents an hour is $63,750. This would result in the amortization of the liability over approximately 49 years. Because the 49–year

schedule is longer than 30 years, the employer would be liable to the plan for 30 annual payments of $63,750.

H.Rep. No, 96–869, 96th Cong., 2d Sess. 83 (*reprinted in* 1980 U.S. CODE CONG. & ADMIN. NEWS 2918, 2951).

This example only works if one assumes that first year interest is included. If first year interest is not included, the amortization period works out to be only 38 years. However, this assumption is not explicitly stated in the legislative history. Rather, it is only derivable by working out the example, which in any event seems directed towards demonstrating the calculation of the annual payment and the limitation on the payout period rather than interest calculations.

Whatever the arguments regarding legislative history as a guide to statutory interpretation, it seems inconceivable that any significant number of Members of Congress would spot an assumption implicit in an example, which would require complicated mathematical calculations to expose. *See Du Art Film Laboratories v. Motion Picture Local 702 Pension Fund*, 10 EBC 1326, 1328 n. 1 (S.D.N.Y.1988) ("The vaunted example that appears in various places in the legislative history, ... which is claimed to support the fund's position because it only works if pre-withdrawal interest is accrued, cannot realistically be said to indicate the intent of any member of Congress, given the complexity of the calculations necessary to recognize that result."); *Carnation Co. Inc. and Central States Pension Fund*, 9 EBC 1409, 1450 (1988) (Nagle, Arb.).

as a withdrawn employer that chose to prepay its withdrawal liability under this section would invariably owe accrued interest.

Brief of *amicus* PBGC at 34 n. 11.

This argument assumes that the only type of prepayment to which the cited paragraph refers is a prepayment made immediately upon receipt of the demand letter. But the paragraph does not refer to "the withdrawal liability" but rather "the outstanding amount of the unpaid annual withdrawal liability payments." The employer may pre-pay the outstanding principal amount of the withdrawal liability at any time during the amortization period, including at a point immediately after a scheduled payment, at which point all accrued interest has been paid. After all, the amortization period can extend as long as 20 years after payments begin. *See* section 1399(c)(1)(B). It is possible that, during that time, long term interest rates could drop below the interest rate assumed in the amortization of the withdrawal liability payments. At that point, an economically rational employer might want to borrow the outstanding amount from a lender at the lower rate, so as to avoid paying interest to the plan at the higher rate. Because interest rates may change, many long term, fixed rate loans provide for a prepayment penalty. Otherwise, during times of low prevailing interest rates, a borrower could pay off a high rate loan, while the lender does not have the equivalent power to call the loan. The statute explicitly rejects any pre-payment penalty.

This also answers the argument raised by the Arbitrator and the Employer that the statute calls for payment "without penalty," and the suggestion by the Arbitrator that

> [i]n certain cases, the employer might elect to tender [prepayment of the withdrawal liability] (assuming a promptly issued demand letter) before the end of the plan year in which withdrawal took

place. To impose upon an employer in that situation an interest penalty [by charging a full year's interest] would appear contrary to the language of the Act and Congressional intent.

7 EBC at 2728.

The penalty to which the Arbitrator referred is not the penalty to which Congress was referring.

But what of the inequity of possible double interest? As we note below, the statute does not provide for pre-demand interest after the first year. In other words, interest will be assessed assuming that payment begins on the first day of the plan year after the withdrawal, whether payments begin before that date, as in the example posited by the Arbitrator, or long after that date, as actually happened in this case. If the employer pays some quantum of interest not really earned, that is fortuity, not penalty. As the PBGC notes in discussing this very point, "Congress was interested in rough equity, not precision." Brief of *amicus* PBGC at 36. An assumption that payments will begin on the first day of the plan year after withdrawal—not before and not after—is just that sort of rough equity.[31] In any event, an employer could avoid this possibility by withdrawing near the end of the plan year.

This same reasoning precludes any assessment of interest for the period between September 30, 1982, and December 1, 1984. Congress clearly distinguished between the presumed first payment date and the actual first payment date. *See* section 1399(c)(1)(A)(i) ("an employer shall pay ... *calculated as if* the first payment were made on.... *Actual payment shall commence* in accordance with paragraph (2).") (emphasis supplied). The actual payment start date is irrelevant here—this calculation is made on an "as if" basis. Accordingly, no interest may be charged for the period between September 30, 1982, and December 1, 1984. There is no inequity in

---

**31.** This also answers the contention made by the PBGC in its reply brief that "it makes no sense for Congress to have provided for interest during the first year but to discontinue interest accruals until the first scheduled payment date following demand." Reply Brief of *amicus* PBGC at 4 n. 2. It makes perfect sense, given that the one year point is a rough approximation of when the payments will begin.

this result, as the delay in making the demand was attributable to the Fund, apparently because of the state of its records. A prompt demand would have obviated its problem. Therefore, we will modify the district court's order with respect to interest to provide only for first year interest.

IV. Payment of Interest to the Employer on the Return of Overpayments

■ As we have indicated, inasmuch as the withdrawal liability payments made by the Employer on the Fund's demand exceeded the withdrawal liability found by the Arbitrator, a refund was required. The Arbitrator ruled that, consistent with PBGC regulations (29 C.F.R. § 2644.3), interest on those overpayments must be paid. He felt that "[i]t would be inequitable and would raise serious constitutional questions to compel the payment of disputed interim payments and then deny to employers who have made such payments under protest the right to recover the true value of any such payments determined to have been improperly collected by the plan." App. at 2056. He also noted that "adoption of a contrary approach could encourage plans to demand excessive withdrawal liability frivolously (or even in bad faith) so as to benefit from the permanent retention of the investment income produced by the interim payments...." *Id.* at 2056–57.

The district court disagreed as it found that interest on overpayments of withdrawal liability is not allowed by ERISA. The court therefore concluded that 29 C.F.R. § 2644(2)(d), requiring the payment of such interest, violated the anti-inurement provisions of the statute. App. at 21–22.

The Employer and *amicus* PBGC urge that the regulation is a valid interpretation by the PBGC of the statute it is charged with administering, and that failure to allow interest on overpayments would render the statute subject to serious constitutional challenge. Though we disagree with the first contention, we agree with the second and thus conclude that the district court must be reversed on this point.

In striking down the regulation, the district court relied on *Airco Industrial Gases, Inc. v. Teamsters Health and Welfare Pension Fund,* 850 F.2d 1028 (3d Cir.1988), a case involving an employer's mistaken overpayment of contributions to a plan. We found that the overpayment could be returned in part, but that interest could not be paid, a result we predicated on the anti-inurement provision of ERISA, which states that .

> [e]xcept as provided in paragraph (2), (3), or (4) or [other exceptions not relevant here] the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and to frame reasonable expenses of administering the plan.

29 U.S.C. § 1103(c)(1).

An exception is provided for payments or contributions made by mistake:

> In the case of contribution, or a payment of withdrawal liability under part 1 of subtitle E of subchapter III of this chapter made by an employer to a multi-employer plan by mistake of fact or law ... paragraph (1) shall not prohibit the return of such contribution or payment to the employer within six months after the plan administrator determines that the contribution was made by such a mistake.

29 U.S.C. § 1103(c)(2)(A)(ii).

We ruled in *Airco* that " '[i]nterest, which is the accrued value of money over time, is not a part of the overpayment but an incident of it. The amount of interest a court might award comes directly from the plan's assets and will deprive participants and beneficiaries of its use.' " *Airco,* 850 F.2d at 1037. Thus, we concluded that "the anti-inurement policy of ERISA bars an award of interest on any refund, regardless of the Fund's financial stability." *Id.*

The PBGC notes that, unlike the mistaken over-contribution situation in *Airco,* the agency has promulgated regulations providing for interest to be paid on over-

payments. *See* 29 C.F.R. § 2644.2(d).[32] The PBGC asserts that Congress was silent with regard to whether interest could be paid, and that, therefore, under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. at 837, 104 S.Ct. at 2778, it is entitled to construe the statute.

The problem with this analysis, however, is that Congress was *not* silent on this issue. As noted by the Supreme Court in *Chevron,* in considering this issue we must first determine "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter...." *Id.* at 842, 104 S.Ct. at 2781.

Section 1103(c)(1) clearly provides that "the assets of a plan shall never inure to the benefit of any employer." If the statute had stopped at that point, one might well argue that overpayments on withdrawal liability were simply never assets of the plan, perhaps under an implicit trust theory. However, the statute goes on to provide exceptions, among them the provision that "[i]n the case of a withdrawal liability payment which has been determined to be an overpayment, paragraph (1) shall not prohibit the return of *such payment* to the employer within six months after the date of such determination." 29 U.S.C. § 1103(c)(4) (emphasis supplied). Accordingly, it is clear that Congress treated even the overpayment as an asset of the plan. But when Congress allowed the return of "such payment," it did not provide for the payment of interest.

32. If the plan sponsor or an arbitrator determines that payments made in accordance with the schedule of payments established by the plan sponsor have resulted in an overpayment of withdrawal liability, the plan sponsor shall refund the overpayment, *with interest,* in a lump sum.
29 C.F.R. § 2644.2(d) (emphasis added).
The interest rate is the same as that on overdue or defaulted withdrawal liability payments, and is based on the prime rate. *See* 29 C.F.R. § 2644.3.

33. While 29 U.S.C. § 1103(c)(4) is part of Title I of ERISA, it was added by section 310(2) of the MPPAA, P.L. 96–364, which also added 29 U.S.C. § 1399. *See* 94 Stat. 1208, 1236–38, 1296.

It is true that Congress did not explicitly prohibit the payment of interest on overpayments. However, the absence of an explicit prohibition does not necessarily create an implicit statutory gap. Rather, we must determine whether "Congress had an intention on the precise question at issue" using "traditional tools of statutory construction." *Chevron,* 467 U.S. at 843 n. 9, 104 S.Ct. at 2781–82 n. 9. *See also Pension Benefit Guarantee Corporation v. LTV Corp.,* — U.S. —, 110 S.Ct. 2668, 2676–77, 110 L.Ed.2d 579 (1990).

One traditional maxim of statutory construction is "expressio unius est exclusio alterius." *See* 2A SUTHERLAND, STATUTORY CONSTRUCTION § 47.23 (4th ed. 1984). As expressed by the Supreme Court in *I.N.S. v. Cardoza–Fonseca,* 480 U.S. 421, 432, 107 S.Ct. 1207, 1213, 94 L.Ed.2d 434 (1987), " '[w]here Congress includes particular language in one section of the statute, but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.' " Congress explicitly provided for interest in some sections of the MPPAA. *See, e.g.,* 29 U.S.C. § 1399(c)(3) (interest for late installments); 29 U.S.C. § 1399(c)(5) (interest in the event of default).[33] To quote another portion of the PBGC's brief, "Congress's silence ... is telling in a statute otherwise so explicit.... Obviously, Congress knew how to provide for interest. It clearly provided for the accrual of interest in other sections of MPPAA." Brief of *amicus* PBGC at 34.[34] Furthermore, though *Airco*

34. The PBGC also suggests that "[b]y requiring a multiemployer plan to refund any withdrawal liability overpayments *with interest,* the PBGC's regulation reduces an employer's natural disincentive to comply with the pay-first rule...." Reply Brief of *amicus* PBGC at 5; *see also* Brief of *amicus* PBGC at 21.
This policy argument is unavailing in the face of Congress' clear intent to deny interest. In any event, it is difficult to understand what sort of "natural disincentive" the PBGC might find. The statute clearly provides that such payments are required. An enforcement mechanism is found in 29 U.S.C. § 1132, which provides for liquidated damages and attorneys fees in addition to interest. These sections, which were found by the *Yahn & McDonnell* court to be

arose in a completely different context, we are bound, at least in the absence of specific provisions elsewhere in law, by its conclusion that the anti-inurement policy of ERISA bars interest on refunds, as there is nothing in 29 U.S.C. § 1103(c)(1) which distinguishes among the situations in which a claim for interest on refunds might arise.

Based solely on the statute, then, the regulation could not stand. However, the Employer and the PBGC suggest that "requiring refunds with interest on employer overpayments is necessary to save the [MPPAA]'s draconian interim payment procedure from serious constitutional defects." Employer's Brief at 45; see Reply Brief of *Amicus* PBGC at 6.

The interim payment procedure is indeed severe. The employer must begin payments no later than 60 days after notification by the trustees of the schedule of liability payments, "notwithstanding any request for review or appeal of determinations of the amount or of the schedule." 29 U.S.C. § 1399(c)(2). Any dispute regarding either of these issues must be resolved through arbitration. *See* 29 U.S.C. § 1401(a)(1); *Carl Colteryahn Dairy, Inc. v. Western Pennsylvania Teamsters and Employers Pension Fund,* 847 F.2d 113, 122–23 (3d Cir.1988), *cert. denied,* 488 U.S. 1041, 109 S.Ct. 865, 102 L.Ed.2d 989 (1989); *Flying Tiger Line v. Teamsters Pension Trust Fund,* 830 F.2d 1241 (3d Cir.1987). Payments must continue in accordance with the schedule "until the arbitrator issues a final decision with respect to the determination submitted for arbitration." 29 U.S.C. § 1401(d). Depending on the amount of the interim payments determined by the trustees, the amount of the withdrawal liability determined by the arbitrator, and the length of the arbitration proceedings, the employer may deprived of (and the trustees allowed) the use of a considerable sum for a substantial period of time.

In *Yahn & McDonnell,* we ruled that the requirement in section 1401(a)(3)(A) that

the trustees' determination be accorded a presumption of correctness was a violation of due process, given the trustees' bias stemming from their "fiduciary duty to the plan, and their consequent personal liability if the plan is not adequately funded." 787 F.2d at 140. However, we were "satisfied that if the arbitrator does not accord the trustees' determination a presumption of correctness, MPPAA will meet the constitutional requirement of providing an impartial decisionmaker." *Id.* at 143. In this administrative context, any harm suffered by an employer from having the initial determination made by a biased decisionmaker was relieved by a *de novo* determination by a neutral arbitrator.

This solution is complete so long as an employer has not been forced to overpay. The arbitrator simply reduces the number or amount of payments the employer is required to make in the future. In *Yahn & McDonnell,* arbitration had not begun, and payments had not been made, so the possibility of overpayment by the employer was not presented. In this case, the problem is manifest. The Employer has been forced by a biased decisionmaker to make what was in effect an interest free loan of excess interim liability payments. A refund would only in part cure the defect, as the difference between permanent and temporary loss of the use of property is a matter of degree, not of kind. *See First English Evangelical Lutheran Church v. County of Los Angeles,* 482 U.S. 304, 318–19, 107 S.Ct. 2378, 2388, 96 L.Ed.2d 250 (1987).

Just as in *Yahn & McDonnell, see* 787 F.2d at 142–43, the constitutional problem can be solved by severing the unconstitutional aspect of the statute. In this case, the least intrusive means of adjusting the statute to preserve its constitutionality is to strike down the application of the anti-inurement clause of section 1103(c) to interest on overpayments of interim withdrawal liability payments. If the Employer can be awarded interest on the overpayment, the harm caused by the biased decisionmaker is alleviated.[35] The Employer is compensated

---

mandatory, *see* 787 F.2d at 134, surely provide strong incentive for compliance.

**35.** In this case the trustees were shown to have influenced Halliwell so that he predicated his

for the loss of the use of the funds, and the incentive for the trustees to seek an interest-free loan is removed.

In the statutory scheme as adjusted, there is a gap, specifically the calculation of the amount of the interest on overpayments. The PBGC regulation, 26 C.F.R. Part 2644, reasonably fills that gap, and is therefore valid. We will therefore reverse the decision of the district court insofar as it invalidates the PBGC regulations providing for interest on refunds of overpayments.[36]

## V. Post-retirement death benefits may not be included in the unfunded vested benefit calculation.

■ The MPPAA provides that only "nonforfeitable" benefits are considered in the calculation of "unfunded vested benefits." 29 U.S.C. § 1393(c). The Fund's

actuary included as vested a $2,500 lump-sum post-retirement death benefit provided by the plan.[37] *See* 7 EBC at 2735. The Arbitrator found these benefits were not "nonforfeitable" under the statutory definition. The district court reversed the Arbitrator on this point, reasoning that "death is not a condition for entitlement to benefits under the plan, but simply the time at which the vested benefits are paid out to plan participants," and that every participant who is vested in the benefit will die eventually.[38] *See* App. at 2097–98.

■ The PBGC suggests that the important question is whether, as of the valuation date, "a participant has satisfied the stated conditions of entitlement to a particular benefit." Reply Brief of *amicus* PBGC at 9. For lump sum death benefits, death is a condition, and it must be met by the valuation date.[39]

conclusion on their "guidance." We are not, however, implying that our result would be different if this was nothing more than a case involving a difference of opinion between a fund and an arbitrator.

36. The Fund urges that if interest must be paid on the refund, it not be at the rates as ordered by the Arbitrator, which were those specified at 29 C.F.R. § 2644.3. *See* Fund's Reply Brief at 30. We doubt that this issue has been properly preserved as, according to the Arbitrator, "[t]he Fund did not question the propriety of the PBGC mandated rate of interest set forth in 29 C.F.R. Section 2644.3, but instead objected herein on the basis that no interest payments at all were permitted by Section 403(c)(2) of ERISA and Section 401(a)(2) of the IRC." In any event, we reject the argument, as the regulation reasonably fills the statutory gap created by our constitutional determination.

37. Article VI, section 3 of the plan provided that "[o]n and after October 1, 1971, a Pensioner under Normal, Early or Disability Pension shall become and remain eligible for Post Retirement Death Benefit coverage in the amount of $2,500." *See* App. at 1745.

38. The district court also relied on *Nachman Corp. v. Pension Benefit Guarantee Corp.*, 592 F.2d 947 (7th Cir.1979), *aff'd*, 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980), for the proposition that the Employer should not be allowed to "walk away from its responsibility to the Fund's pensioners." In *Nachman* the employer attempted to avoid paying for an underfunded plan that it was terminating, citing a clause in the collective bargaining agreement which provided that only those benefits that could be

provided by the assets of the plan would be paid, and that in the event of the termination of the plan, the employer would have no further obligation to contribute. *See Nachman*, 446 U.S. at 365, 100 S.Ct. at 1728. The Supreme Court concluded that the contract provision in question "merely disclaims direct employer liability and imposes no condition on the benefits.... Giving the employer protection against liability does not qualify the beneficiary's rights against the plan itself." *Id.* at 369–72, 100 S.Ct. at 1730–31. The Supreme Court therefore concluded that the benefits were nonforfeitable, and the employer was liable for reimbursement to PBGC.

By contrast, this case has nothing to do with the limitations of a plan. Here, the statute and the PBGC's regulations provide the relevant limitations. In order for a benefit to be nonforfeitable, the beneficiary must have satisfied all of the requirements under the plan, unless the beneficiary qualifies for one of the statutory exceptions. Consequently, *Nachman* is not applicable here.

39. Under 29 C.F.R. § 2613.4(c)(1), an exception is made for lump-sum death benefits which are "substantially derived from a reduction in the pension benefit payable to the participant or surviving beneficiary." The PBGC explains that under those circumstances, the survivor's entitlement to the benefit is derived from the participant's satisfaction of the conditions for entitlement for his or her pension. *See* Reply Brief of *amicus* PBGC at 11.

The Fund argues that the death benefits fall within this exception because, "by absorbing part of the funding available for annuity bene-

The PBGC has taken the position since 1975 that lump sum death benefits are not non-forfeitable. In final rules promulgated at 40 Fed.Reg. 43,509 (1975), the PBGC stated that

> a benefit payable with respect to a participant is considered to be nonforfeitable, if on the date of termination of the plan the participant has satisfied all of the conditions required of him under the provisions of the plan to establish entitlement to the benefit, except the submission of a formal application, retirement, or the completion of a required waiting period.

40 Fed.Reg. at 43,511 [codified at 29 C.F.R. § 2605.6(a)] [since amended and redesignated 29 C.F.R. 2613.6(a)].

Moreover, the PBGC stated that it would

> not guarantee a benefit payable in a single installment (or substantially so) upon the death of a participant or his surviving beneficiary unless that benefit was substantially derived from a reduction in the pension benefit payable to the participant or surviving beneficiary.

40 Fed.Reg. at 43,511 [codified at 29 C.F.R. § 2605.4(c)] [now redesignated 29 C.F.R. 2613.4(c)].[40]

In 1980, Congress codified the PBGC's regulation, which the committee report described as "correctly stat[ing] the definition of 'nonforfeitable.'"[41] That definition is:

> 'Non-forfeitable benefit' means, with respect to a plan, a benefit for which a participant has satisfied the conditions or requirements under the plan or the requirements of this chapter (other than submission of a formal application, retirement, completion of a required waiting period, or *death in the case of a benefit which returns all or a portion of a participant's accumulated mandatory employee contributions upon the participant's death*), whether or not the benefit may subsequently be reduced or suspended by a plan amendment, and occurrence of any condition, or operation of this chapter or Title 26.

29 U.S.C. § 1301(a)(8) (emphasis supplied).

The PBGC notes that "[i]f Congress had intended all death benefits to be non-forfeitable, it could easily have drafted the language of [§ 1301(a)(8)] to accomplish that purpose." Brief of *amicus* PBGC at 291. The Fund fails to explain why Congress chose to qualify "death" if all death benefits were to be considered vested.[42]

---

fits, [they] are included in the Plan at the 'expense' of greater monthly annuity benefits." Fund's Reply Brief at 22. However, the PBGC has rejected the position that such collective bargaining trade-offs constitute reductions. *See* PBGC Opinion Letter 76–103 (August 23, 1976). This is a reasonable construction of the agency's own regulation, which is entitled to our deference.

**40.** The reasoning for this refusal is that the purpose of the PBGC is "to provide for the timely and uninterrupted payment of *pension* benefits," *see* 29 U.S.C. § 1302(a)(2); *see also* 40 Fed.Reg. at 43509 ("the purpose of a pension is to provide retirement income to a participant or income to his beneficiaries, and the purpose of the guarantee is to insure the maintenance of such income.") The statute which creates withdrawal liability is known as the "Multiemployer *Pension* Plan Amendments Act," and the legislative history notes that the "primary purpose of the legislation is to protect retirees and workers ... against the loss of their *pensions*." H.Rep. No. 96–869, 96th Cong., 2d Sess. 51 (*reprinted in* 1980 U.S.CODE CONG. & ADMIN.NEWS 2918, 2919).

A pension benefit is defined by the PBGC regulations as "a benefit payable as an annuity, or one or more payments related thereto ... which payments by themselves or in combination with Social Security, Railroad Retirement, or workmen's compensation benefits provide a substantially level income to the recipient." 29 C.F.R. § 2613.2. The lump-sum death benefits at issue are therefore not pension benefits. *See generally*, S. BRUCE, PENSION CLAIMS: RIGHTS AND OBLIGATIONS 591 (1988).

**41.** *See* Senate Committee on Labor and Human Resources, S. 1076, THE MULTIEMPLOYER PENSION PLAN AMENDMENTS ACT OF 1980: SUMMARY AND ANALYSIS OF CONSIDERATION 34 (1980).

**42.** The PBGC suggests that Congress gave further support to its construction of "nonforfeitable" by adding another exception in 1986 for pre-retirement survivor annuities in single-employer plans. *See* 29 U.S.C. § 1322(e). This is questionable. In the legislative history of the 1986 amendment, the House Committee acknowledges PBGC's construction, notes that the amendment reverses it in this one area, but states that "[t]he Committee intends that no inference be drawn as a result of this amendment as to whether or not these benefits were

By referring to "death" in a list of exceptions to "conditions or requirements" of the plan that must be satisfied, Congress clearly contemplates that death can be a "condition or requirement" for entitlement to a death benefit. By limiting this exception to the case of a certain type of benefits, Congress implicitly denies the exception to the case of other types of benefits. Since the lump-sum death benefit in this case had nothing to do with the return of mandatory employee contributions, the exception has no application to this case. We will therefore reverse the district court and hold that lump-sum benefits are not to be included in the calculation of unfunded vested benefits.

## VI. Informal written adoption of plan changes by the Trustees was effective.

■ The Employer challenges two categories of amendments to the plan: first, a number of increases in benefits, and second, a change in the method for allocating liabilities among employers. ERISA requires that "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument." 29 U.S.C. § 1102(a)(1). "A written plan is required in order that every employee may, on examining the plan documents, determine exactly what his rights and obligations are under the plan." H.R.Conf.Rep. No. 1280, 93d Cong., 2nd Sess., *reprinted in* 1974 U.S. CODE CONG. & ADMIN. NEWS 4639, 5038, 5077–78.

### A. Benefit increases

The Arbitrator found as a fact that the benefit increases were not embodied in an *executed* plan document. *See* 7 EBC at 2738. However, he also found that these

changes had all been adopted pursuant to resolutions of the Board of Trustees, and *written* in the minutes of the meetings. *See* 7 EBC at 2739. He noted that "[t]he plan amendment provisions of the executed, 1976 Plan document, granted the Trustees broad powers to amend the plan, without limitations on the particular format of such actions." *Id.*[43] Moreover, he found that

> there was no dispute that the Employer was aware of the benefit increases as they were implemented.[44] Further, despite its representation on the Board of Trustees, no objection was raised by the Employer prior to its withdrawal regarding either the increases in benefits or the lack of any contemporaneous written, signed amendment to the Plan with regard to those increases.

*Id.* at 2740.

He concluded that the amendments were effective because of the actions of the Trustees in

> a) considering improvements in benefit levels,
>
> b) seeking actuarial advice concerning the proposed benefit improvement,
>
> c) determining by resolution and unanimous vote of the Fund Trustees that the improvement in benefits is warranted,
>
> d) confirming those resolutions by written minutes signed and dated by the Plan Administrator, and
>
> e) implementing those benefit improvements.

*Id.* at 2738–39.

The district court upheld the Arbitrator on this point.

---

already guaranteed under existing law...." H.R.Rep. 99–241(II) 59, *reprinted at* 1986 U.S. CODE CONG. & ADMIN.NEWS 42, 685, 717.

**43.** "At any time and from time to time the Trustees may amend or modify this plan in whole or in part...." App. at 1881 (1976 Plan, Article VII, Section 1).

**44.** The district court upheld the Arbitrator's decision on the ground that Employer had notice of the increases, and was therefore estopped from challenging them. App. 2103–04. Be-

cause we hold that the plan changes were adopted with sufficient formality to be binding, we do not review this conclusion. We do note that, despite the authority cited by the Employer to the contrary, the only case from this court cited, *Rosen v. Hotel and Restaurant Employees & Bartenders Union*, 637 F.2d 592, 598 (3d Cir.), *cert. denied*, 454 U.S. 898, 102 S.Ct. 398, 70 L.Ed.2d 213 (1981), held that estoppel can, in extreme circumstances, be applied in an ERISA case.

The Employer relies on *Nachwalter v. Christie*, 805 F.2d 956, 960 (11th Cir.1986), for the proposition that " 'Congress expressly prohibited informal ... amendments of ERISA plans.' " *See* Employer's Brief at 20. However, *Nachwalter* does not help the Employer. The issue in *Nachwalter* was whether an oral modification to a plan would be recognized. The court, in interpreting ERISA to prohibit "informal written modifications," noted that:

> ERISA requires that each plan shall 'provide a procedure for amending such plan, and for identifying the persons who have authority to amend the plan.' 29 U.S.C. § 1102(b)(3). By explicitly requiring that each plan specify the amendment procedures, Congress rejected the use of informal written amendments.

*Id.*

We read *Nachwalter* to prohibit amendment of a plan by such informal means as an oral communication or a letter to a participant. We recently held, relying in part on *Nachwalter*, that "ERISA precludes oral amendments to employee benefit plans." *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1163 (3d Cir.1990). However, we have also recently recognized that

> in order not to frustrate the legitimate expectation of employees courts have upheld plans that do not meet the reporting, disclosure, and other formality requirements of ERISA.... Where a plan has complied with ERISA by setting forth a method for accomplishing amendment, of course each putative amendment will be evaluated by reference to that method.

*Frank v. Colt Industries, Inc.*, 910 F.2d 90, 97–98 (3d Cir.1990).

Here the plan had a procedure for amendment—modification by "the Trustees"—and the Arbitrator found that this procedure was followed at a regularly constituted Board meeting, and recorded in writing in the minutes of the meeting. We therefore accept the Arbitrator's conclusion that the benefit increases were duly adopted amendments to the plan.

The Employer also notes that on the annual reports filed with the United States Department of Labor (Form 5500), the trustees indicated under penalty of perjury that no amendments to the plan had been adopted. We agree with the Arbitrator that "[w]hatever the consequences that may flow in other forums from the Trustees' failure to have reported those amendments, that failure cannot be found to invalidate the plan amendments." App. at 2004. Thus, we will affirm the order of the district court on this issue.

### B. Changes in attribution method

The MPPAA provides that the withdrawing employer's share of the plan's unfunded vested benefits shall be calculated by one of four methods, any of which is freely adoptable by the plan, or by another method if approved by the PBGC. *See* 29 U.S.C. § 1391(c); *see generally* Feuer, *The Selection and Arbitration of Withdrawal Liability Interest Rates*, EMPLOYEE BENEFITS JOURNAL, March 1985, at 23, 24–25.

If a plan does not elect otherwise, the "presumptive method" is used. That method allocates the unfunded vested benefits based on the contributions of the various employers over the past years. *See* 29 U.S.C. § 1391(b)(1). The Fund purportedly adopted one of the statutory alternatives, commonly known as the "direct attribution method," in which the unfunded vested benefits are allocated based on each participant's service with each employer. This method requires extremely complete and accurate records, *see* Feuer, *supra*, at 24, which the Fund lacked. *See* 7 EBC at 2732.

The Fund allocated the unfunded vested benefits using the direct attribution method, but used a "last employer" assumption, which presumed that *all* of the benefits earned by each employee were earned with his or her last employer, as of the calculation date. The Arbitrator found, based on the minutes of a Board of Trustees meeting on January 28, 1981, that the Fund had adopted the direct attribution method of allocating unfunded vested benefits. *See* 7 EBC at 2732. However, the minutes said

nothing about the "last employer" rule. The Arbitrator concluded that the Fund's adoption of the direct attribution method was effective. 7 EBC at 2733. We accept this conclusion for the reasons expressed in our discussion of the benefit increases. Thus, we will reverse the district court's order which required recomputation of the Employer's liability by use of the presumptive method.

The Employer questions whether the "last employer" assumption was duly adopted by the Trustees, and, if it was, whether the addition of the assumption transformed the attribution method from one acceptable under section 1391(c)(4) without PBGC approval to an alternative method that required PBGC approval under section 1391(c)(5). We need not reach this issue, as we accept the Arbitrator's finding that, given the unrebutted testimony of extremely low employee interchange between the two employers, one may view the last employer assumption as a reasonable simplifying assumption by the Fund actuary. *See* 29 U.S.C. § 1393(a)(1); 7 EBC at 2735.

VII. The Second Assessment of Withdrawal Liability.

At the conclusion of his first Opinion and Award, on December 13, 1986, the Arbitrator directed the Fund to recalculate the Employer's withdrawal liability and retained jurisdiction to review that reassessment. On February 19, 1987, the Fund issued its redetermination of withdrawal liability, but included in this redetermination liabilities for a total of 120 employees (84 of them attributable to the Employer) allegedly erroneously excluded from the Fund's first calculation. The Employer moved to strike the addition of this new information, and the Arbitrator granted this motion. The Fund challenged this decision in the proceedings before the district court. The district court dismissed this challenge, finding the issue moot because of the Fund's issuance of a second withdrawal liability assessment.

We consider questions of mootness under a plenary standard of review.

*See International Brotherhood of Boilermakers v. Kelly,* 815 F.2d 912, 914 (3d Cir.1987). We have found that the "central question" in mootness inquiries is " 'whether changes in circumstances that prevailed at the beginning of the litigation have forestalled any occasion for meaningful relief.' " *Id.* at 915. We find that there is a possibility for meaningful relief here, since, if the Arbitrator erred in striking the new material, the case may be remanded to him with instructions to admit the additional evidence and substantive consequences could follow. Furthermore, it is conceivable that the results of a new arbitration might be different than those obtained at a reopening of the original proceedings. Overall, therefore, we find that the rendering of the second assessment does not make the challenge to the Arbitrator's order striking the new information moot and we consider the order on the merits.

We will review the selection of factors the Arbitrator considered in deciding whether to strike the additional information under a plenary standard of review, but will review the application of those standards to the facts of this case under the deferential standard mandated by the statute. The new data was discovered by the Fund during a recomputation process in progress during the arbitration hearing. The Arbitrator found as fact that "the Fund did not deliberately conceal the corrected, updated data." App. at 2024. In considering the Employer's motion to strike the introduction of this new material, and the Fund's opposition thereto, the Arbitrator found that four issues were raised:

1) Did the first award specifically sanction the Fund's inclusion of liabilities associated with participant data different from that employed in the initial withdrawal liability determination?

2) If not, do adequate grounds exist for reopening the record to include this new, more accurate data?

3) If not, do adequate grounds exist for an arbitral grant of relief from the first award?

4) If not, do section 1399 and/or 1401 preclude or permit the issuance of the

supplemental determination at this time by the Fund based upon the new data and would any such supplemental determination be within the jurisdiction of the arbitrator in this case?

App. at 2028 (Arbitrator's decision on motion to strike).

■■■■ The Arbitrator answered the first question, whether his initial award permitted the introduction of new data, with a resounding "no." *See* App. at 2031. With regards to the second question, whether adequate grounds existed for reopening the record, the Arbitrator determined that, based upon any regulations applicable,[45] reopening would depend upon the satisfaction of three conditions:

1) The reopening is likely to result in new information that will have a material effect on the outcome of the arbitration;

2) Good cause exists for the failure of the party that requested reopening to present such information at the [initial] hearing;

3) The delay caused by the reopening will not be unfairly injurious to any party.

App. at 2034.

The Arbitrator found that the first of these requirements had been met, since the relevance and materiality of the new participant data was not disputed by the parties, and since the inclusion of that data would significantly increase the employer's liability. He also concluded that the delay did not cause any injury to the Employer, since the Employer would still retain the opportunity to challenge the validity of the re-

vised data as well as the calculations made on the data. The Arbitrator found that the Employer's claim that it would be subjected to endless litigation was "unpersuasive when balanced against the Fund's strong interest in being fairly compensated for withdrawal liability properly due and owing in this case." App. at 2034–35.

However, the Arbitrator found that the Fund did not meet the second, "good cause" prong of the test:

The question of the accuracy and completeness of the Fund's data was raised repeatedly by the Employer during the trial of the arbitration case. The Fund and its actuary consistently and repeatedly replied that the state of the Fund's records was excellent and more than adequate for purposes of the computation of the amount of withdrawal liability due by the Employer. No persuasive reason was proffered by the Fund as to why it neither completed the recomputation prior to the close of the hearings nor moved prior to the close of the hearings and the issuance of the Interim Opinion and Award to reopen the record for the receipt of the results of that reposting of the underlying data.

App. at 2035–36.

■■■ The Fund objects to the Arbitrator's application of the "good cause" standard. The Fund suggests, without support, that "this standard simply means that the reason must be other than tactical." Fund's Brief at 42. We reject this interpretation, which ignores the word "good" in "good cause."

---

45. The applicable regulations were the AAA MPPAA arbitration rules, which were adopted by the Fund, specifically the 1981 version of those rules, which were in effect at the start of the arbitration. Section 31 of those rules provided that "[t]he hearings may be reopened on the Arbitrator's own motion, or upon application of a party at any time before the award is made." The Arbitrator decided, and we agree, that the rule did not contemplate "a relaxed, pure equity, standard with regard to arbitral reopening of hearings, particularly after an Interim Opinion and Award has been issued. The principle of finality also is applicable to [MPPAA] arbitration proceedings." App. at 2037. *See also Washington–Baltimore Newspa-*

*per Guild, Local 35 v. Washington Post Co.,* 442 F.2d 1234, 1238 (D.C.Cir.1971) ("'Unless parties are bound by the records made before the arbitrators, the piecemeal or staggered submission of evidence would be likely to erode the effectiveness of arbitration as a speedy and efficient forum for resolving labor disputes.'")

In light of the principle of finality, the Arbitrator interpreted the general statement of the 1981 rule in light of the detailed standard of the 1986 AAA rule and the PBGC regulations. We agree with this analysis. The Fund proposes different interpretations of the standard, but all require "good cause" for the failure to present the new evidence at the original hearing.

The Arbitrator also found that no adequate grounds existed for an arbitral grant of relief from the interim award. The Arbitrator expressed doubt as to whether he had the power to set aside a final order as is enjoyed by the federal judiciary pursuant to Fed.R.Civ.P. 60, and found that even if he had such power, he was not persuaded that this is a case in which the requirements of Rule 60(b) had been met.[46] *See* App. at 2041. The Fund suggests that, even under the due diligence standard of the federal rules, "a new trial may be granted after trial is concluded to prevent a manifest injustice." Fund's Brief at 42. However, in *Moolenaar v. Gov't of the Virgin Islands,* 822 F.2d 1342 (3d Cir. 1987), this court held that the fact that a "manifest injustice" might occur is not sufficient to justify a new trial. Rather, "the exercise of a district court's discretionary power [to grant a new trial] requires an extraordinary circumstance." *Id.* at 1346–47. The only extraordinary circumstances in this case are that the Fund, despite the statutory command that it notify the Employer of the amount of the withdrawal liability "as soon as practicable" after withdrawal, issued its initial demand more than two and one half years after withdrawal, and that this newly discovered evidence was first presented almost five years after the withdrawal. These circumstances did not demonstrate manifest injustice to the Fund.

The Arbitrator then considered the question of whether section 1399 or section 1401 of 29 U.S.C. precluded or permitted the issuance of a supplemental withdrawal liability determination. He ultimately declined to rule on this question, as he concluded that he lacked jurisdiction to do so. App. at 2047. We express no views as to the correctness of this conclusion, as it is not challenged by either of the parties.

We have carefully reviewed the Arbitrator's reasons for striking the new information and conclude he was clearly correct. In the circumstances we have determined that it is not necessary to expand on his reasoning.

 Of course, the district court's conclusion that the review of the order striking the additional information was moot did not resolve the direct challenge to the assessment. The district court concluded that any questions as to whether the second assessment was precluded by the doctrine of res judicata, or whether the employer had properly and timely initiated arbitration on the second demand should, in the first instance, be decided by an Arbitrator. The court noted that the statute provides that "[a]ny dispute between an employer and the plan sponsor of a multiemployer plan concerning the determination under sections 1381 to 1399 of this title shall be resolved through arbitration." 29 U.S.C. § 1401(a)(1). "[H]ere, Casablanca is questioning the Fund's legal power under 29 U.S.C. 1399 to issue a second assessment of withdrawal liability." App. at 2108–09.[47]

---

**46.** We need not reach the question of the Arbitrator's power, given the Arbitrator's finding, with which we agree, that the requirements of Rule 60(b) were not met.

**47.** The district court also ruled that the Employer was responsible for making interim payments of withdrawal liabilities pursuant to the second assessment. This issue is presented to us because of the Employer's challenge to the validity of the second assessment.
The statute provides that:
Withdrawal liability shall be payable in accordance with *the* schedule set forth by the plan's sponsor under subsection (b)(1) of this section beginning no later than 60 days after the date of *the* demand notwithstanding any request for review or appeal of determinations of the amount of such liability or of *the* schedule.

29 U.S.C. § 1399(c)(2) (emphasis supplied).
Whether or not the Fund is entitled to adjust its demand on its first assessment, or issue a second assessment, it should only have one opportunity for interim payments. The statute clearly contemplates a single schedule of interim payments. "[W]e would find it quite curious if Congress had given multiemployer plans the immense power ... to assess upon a withdrawing employer a substantial penalty while providing the employer with few defenses—yet did not intend to place some check" upon the exercise of this power. *Carl Colteryahn,* 847 F.2d at 121. Allowing plans to issue repeated demands for withdrawal liability, with accompanying interim payments, could lead to abuse. The Fund has had one bite at the interim payment apple, and subsequent nibbles are neither necessary nor appropriate.

**110**

This result is fully supported by our decisions in *Flying Tiger Line v. Teamsters Pension Trust Fund*, 830 F.2d at 1241, and *Carl Colteryahn Dairy, Inc. v. Western Pennsylvania Teamsters and Employers Pension Fund*, 847 F.2d at 113 and we will affirm it. In *Flying Tiger*, we "emphasize[d] the importance of 'the legislature's decision that arbitration, and not the courts, is the proper forum for the initial resolution of disputes [under MPPAA.]' " 830 F.2d at 1249. *Colteryahn* involved an employer's withdrawal from a multiemployer fund which had recently absorbed the smaller fund of which the employer had been a member. There we distinguished between two claims: whether certain payments made at the time of the merger should be considered contributions for the purpose of calculating withdrawal liability, a claim we found subject to arbitration, and a claim that the employer had been fraudulently induced to assent to the merger, a claim we found not subject to arbitration because it "concern[ed] events external to the actual calculation" of the withdrawal liability. *See* 847 F.2d at 123. *See also Crown Cork & Seal Co. v. Central States etc. Pension Fund*, 881 F.2d 11, 19 (3d Cir.1989).

The claims raised by both parties regarding the second assessment all concern the validity of the assessment, and arbitral procedure. These issues are central to the calculation of the withdrawal liability, and are reserved for arbitration.

## CONCLUSION

We will affirm the order of the district court of October 30, 1989, insofar as it accepted the Arbitrator's calculation of assets, ordered the use of an 8% amortization rate for withdrawal liability payments, accepted the inclusion of the benefit increases, and directed arbitration of the second assessment. We will reverse the order of October 30, 1989, insofar as it struck down the PBGC regulations on interest for overpayments, mandated inclusion of post-retirement death benefits in the liability calculations, refused to accept the change in attribution method, and directed payment of interim payments on the second assessment. We will modify the district court's calculation of pre-demand interest to provide only first-year interest. We will further modify the order of the district court so that the order of the Arbitrator striking the Employer's motion to add the new information is upheld. The case will be remanded to the district court for further proceedings consistent with this opinion.