**TRUSTEES OF IRON WORKERS LOCAL 473 PENSION TRUST, Plaintiff–Appellee,**

v.

**ALLIED PRODUCTS CORPORATION, Defendant–Appellant.**

No. 87–2108.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 7, 1989.

Decided April 13, 1989.

Stephen P. Bedell, Gardner Carton & Douglas, Chicago, Ill., for defendant-appellant.

Charles B. Wolf, Vedder Price Kaufman & Kammholz, Chicago, Ill., James J. Armbruster, Pension Benefit Guar. Corp., Washington, D.C., for plaintiff-appellee.

Before FLAUM, MANION, and KANNE, Circuit Judges.

MANION, Circuit Judge.

Allied Products Corporation ("Allied") appeals the district court's decision granting summary judgment in favor of the Trustees ("Trustees") of Iron Workers Local 473 Pension Trust ("the Plan"). The Trustees sought to vacate or modify a withdrawal liability arbitration award and to collect withdrawal liability payments under the Employee Retirement Income Security Act of 1974, as amended by the Multiemployer Pension Plan Amendments Act of 1980. The arbitrator had held that Allied completely withdrew from the Plan in the plan year ending June 30, 1984, while the Trustees claimed that Allied completely withdrew from the Plan in the plan year ending June 30, 1983. (Depending on the date of Allied's withdrawal, there is a swing of nearly $200,000 in the amount owed in withdrawal liability.) The district court vacated the arbitrator's award. For the reasons stated below, we reverse the district court's judgment, but hold that it properly reviewed the arbitrator's legal determinations de novo.

I.

The facts are straightforward and undisputed.[1] Since May 1, 1959, Allied and Shopmen's Local Union No. 473 of the International Association of Bridge, Structural and Ornamental Iron Workers, AFL–CIO ("Union") were parties to collective bargaining agreements covering production and maintenance employees at Allied's plant in Bedford Park, Illinois. These

1. With slight modification we have lifted the magistrate's recitation of the facts, and note that the parties stipulated to the facts before the arbitrator.

agreements required, among other things, contributions by Allied to the Plan based on each hour worked by covered employees. The Plan was most recently amended and restated as of May 1, 1979.

The pension plan year ("plan year") runs from July 1 through June 30. On June 16, 1982, Allied informed the Union that it would permanently shut down its Bedford Park plant operations. On July 2, 1982, Allied and the Union executed a Shutdown and Severance Pay Agreement which stated in part: "[t]he terms and conditions as set forth in the collective bargaining agreement ... as amended, shall continue in full force and effect, except as hereinafter modified by this Severance Agreement, as long as any bargaining unit member remains employed."

In the plan year ending June 30, 1982, Allied contributed $79,669.91 for 111,573 participant hours. For the plan year ending June 30, 1983, Allied's contributions declined to $10,338.56 for 13,854.75 participant hours. From July 1, 1983, through December 1983, Allied's contributions fell to $1,432.50 for 1,910 participant hours.

There were 48 employees working for Allied for the payroll week ending July 4, 1982. Five employees remained at the plant by the end of August 1982. Of these five, two were terminated in September and two more in December 1983. One employee, Donald Steele, a maintenance man, worked continuously at the Bedford Park plant and was still on the payroll at the end of December 1983. Two of the five remaining employees, Charles Hearod, a forklift operator, and Lester Banks, a fitter/welder, were recalled by Allied in February 1983. Banks subsequently was terminated in April 1983, while Hearod worked at the plant continuously from the date of his recall through December 1983.

Banks was called back to work for the purpose of welding and finishing certain heat exchangers which were preassembled but not finished. Hearod and Steele assisted in the finishing work as well, and also worked the shear press and brake press to machine certain seal retainers in August and/or September 1983 for approximately ten hours each. In June 1983, these employees also performed 16 hours of welding on exhaust duct assembly units. All other work performed by these employees included cleaning and maintenance work and the identification, weighing and shipment of parts, scrap, raw materials and fixtures in inventory. These activities, it was stipulated, all constituted bargaining unit work.

Although Allied informed the Union in June 1982 of its intent to permanently shut down its Bedford Park plant operations, Allied still received, processed and filled seven purchase orders during 1983, the last one in September 1983. In addition, after July 1, 1982, Allied identified, loaded and shipped numerous items of scrap, parts, and fixtures to its other divisions.

On November 15, 1982, the Trustees sent Allied a notice of multiemployer plan withdrawal liability, a demand for payment of $559,108.57, and stated that the entire amount was due by January 1, 1983. Alternatively, the Trustees permitted Allied to make 27 monthly installment payments of $23,791.33 with a 28th payment of $7,495.81, beginning January 1, 1983. The amount of withdrawal liability was determined by the Trustees as of June 30, 1982, based on the Trustees' conclusion that a complete withdrawal had occurred during the plan year ending June 30, 1983.

On February 14, 1983, Allied submitted to the Trustees a request for review. On June 17, 1983, the Trustees responded to Allied's request, refusing to alter its November 15, 1982 notice and demand. Allied then initiated arbitration proceedings on August 10, 1983, seeking review of the Trustees' determination under 29 U.S.C. § 1401(a).

The arbitrator concluded that "the Plan's determination that [Allied] withdrew from the Plan during the plan year ending June 30, 1983 and that [Allied's] withdrawal liability should therefore be determined based on the Fund's unfunded vested benefits as of June 30, 1982 is clearly erroneous and must be set aside." The arbitrator further concluded that a complete withdrawal had occurred during the plan year ending June 30, 1984, and that the Plan should immedi-

ately determine Allied's withdrawal liability based on the Fund's unfunded vested benefits as of June 30, 1983.

The district court referred the Trustees' suit to vacate the arbitration award to a magistrate. Reviewing the arbitrator's decision de novo, the magistrate held that the arbitrator misinterpreted 29 U.S.C. § 1383(a)(2) (withdrawal occurs when an employer permanently ceases all covered operations), and thus vacated the award. The arbitrator read § 1383(a)(2) literally (all means all), while the magistrate, relying on a single passage of legislative history, held that all meant "virtually all." Under the latter interpretation, the magistrate held that Allied completely withdrew from the Plan in the plan year ending June 30, 1983, as the Trustees claimed. The district court adopted the magistrate's report and recommendation, writing separately to emphasize the court's authority to review de novo the arbitrator's decision.

## II.

We confront two issues on appeal:[2] the proper standard of review of an arbitrator's award, and the interpretation to be given 29 U.S.C. § 1383(a)(2).

### A. Statutory Background

ERISA subjects employers who withdraw from multiemployer pension plans to so-called withdrawal liability in an amount equal to their statutory share of the plan's unfunded vested liabilities. 29 U.S.C. § 1381. A "complete withdrawal" occurs when an employer "(1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all cov-

ered operations under the plan." 29 U.S.C. § 1383(a).[3] "[T]he date of a complete withdrawal is the date of the cessation of the obligation to contribute or the cessation of covered operations." 29 U.S.C. § 1383(e).

Following an employer's withdrawal from a multiemployer pension plan, the plan sponsor is required to determine the amount of withdrawal liability owed, notify the employer of this amount, and demand payment. 29 U.S.C. §§ 1382, 1399(b)(1). The amount of an employer's withdrawal liability is determined as of the last day of the plan year preceding the plan year in which the withdrawal occurs.[4] 29 U.S.C. § 1391(b)(2)(A). Within 90 days after notice and demand have been made, the withdrawing employer may request that the Plan review its determination. 29 U.S.C. § 1399(b)(2)(A). The Plan must notify the employer of its decision after its review. 29 U.S.C. § 1399(b)(2)(B). An employer may then initiate arbitration within the 60-day period after the earlier of (1) the date of notification to the employer of the Plan's decision on review, or (2) 120 days after the date of the employer's request for review. 29 U.S.C. § 1401.

Any party to the arbitration may appeal to an appropriate federal district court to "enforce, vacate, or modify the arbitrator's award." 29 U.S.C. § 1401(b)(2). "[T]o the extent consistent with [Title IV of ERISA]," arbitration proceedings "shall ... be conducted in the same manner, subject to the same limitations, carried out with the same powers (including subpoena power), and enforced in United States courts as an arbitration proceeding carried out under Title 9 [ (Federal Arbitration Act) ]." 29 U.S.C. § 1401(b)(3). On review,

---

**2.** We are aided by the Pension Benefit Guaranty Corporation's ("PBGC") *amicus curiae* brief. The PBGC's views are entitled to deference because of its responsibility to enforce Title IV of ERISA, 29 U.S.C. §§ 1301–1461 (which includes ERISA's withdrawal liability provisions). *Robbins v. McNicholas Transportation Co.,* 819 F.2d 682, 686 (7th Cir.1987).

**3.** On appeal, the Trustees have abandoned their claim that Allied ceased to have an obligation to contribute under the Plan. 29 U.S.C. § 1383(a)(1).

**4.** This is what this dispute really is all about. If Allied's withdrawal is said to have occurred in the plan year ending June 30, 1984, as Allied urges, the alleged withdrawal liability equals $364,000. If, on the other hand, the Trustees are correct and a complete withdrawal occurred in the plan year ending June 30, 1983, the alleged withdrawal liability jumps to $559,108.57. (Given our resolution of this case, we need not consider whether the Trustees are correct in asserting that the district court made a clerical error and that this amount should be $599,-108.57.)

"there shall be a presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator were correct." 29 U.S.C. § 1401(c).

### B. Arbitrator's Award; Standard of Review

 Like every other federal appellate court which has addressed this question, we hold that district courts may fully review the arbitrator's legal determinations. *Union Asphalts and Roadoils, Inc. v. Mo-Kan Teamsters Pension Fund,* 857 F.2d 1230, 1233–34 (8th Cir.1988); *Trustees of Amalgamated Ins. Fund v. Geltman Industries, Inc.,* 784 F.2d 926, 928–29 (9th Cir.), *cert. denied,* 479 U.S. 822, 107 S.Ct. 90, 93 L.Ed.2d 42 (1986); *Board of Trustees of the Western Conference of Teamsters Pension Fund v. Thompson Bldg. Materials, Inc.,* 749 F.2d 1396, 1405–06 (9th Cir.1984), *cert. denied,* 471 U.S. 1054, 105 S.Ct. 2116, 85 L.Ed.2d 481 (1985); *Int'l Ass'n of Machinists Nat'l Pension Fund Benefit Plan C v. Stockton Tri Industries,* 727 F.2d 1204, 1207 n. 7 (D.C.Cir.1984); *Republic Industries, Inc. v. Teamster Joint Council No. 83 of Virginia Pension Fund,* 718 F.2d 628, 641 (4th Cir.1983), *cert. denied,* 467 U.S. 1259, 104 S.Ct. 3553, 82 L.Ed.2d 855 (1984).

We also agree with the Eighth Circuit that neither *United Retail & Wholesale Employees Teamsters Union Local No. 115 Pension Plan v. Yahn & McDonnell, Inc.,* 787 F.2d 128 (3d Cir.1986), *aff'd by an equally divided court,* 481 U.S. 735, 107 S.Ct. 2171, 95 L.Ed.2d 692 (1987) (per curiam) nor *Washington Star Co. v. Int'l Typographical Union Negotiated Pension Plan,* 729 F.2d 1502 (D.C.Cir.1984) are to the contrary. As that court explained:

> In *United Retail* and *Washington Star Co.,* the courts did not review an arbitra-

tor's legal determinations; instead, the courts dealt with constitutional issues involving MPPAA. *See United Retail,* 787 F.2d at 129; *Washington Star Co.,* 729 F.2d at 1503. We do not believe either decision can be characterized as designating a standard for review of the arbitrator's legal determinations. *See United Retail,* 787 F.2d at 135 n. 9 (passing remark in a footnote); *Washington Star Co.,* 729 F.2d at 1505 (introductory outline of section 1401 that did not mention *Stockton Tri Industries,* 727 F.2d at 1207 n. 7). Thus, although UA looks to *United Retail* and *Washington Star Co.* for support, the courts in those cases did not decide the current issue.

*Union Asphalts,* 857 F.2d at 1233–34. Moreover, we reject Allied's argument that *Washington Star, supra,* overruled *Stockton Tri Industries, supra.* These cases were decided only a few weeks apart, *Washington Star* (the latter of the two) made no mention of *Stockton Tri Industries,* let alone claimed to overrule it, and Judge Edwards, the author of *Washington Star,* was on both panels.[5]

We also find *United Retail* unpersuasive (on the standard of review issue) for another reason. There, the Third Circuit refused to read § 1401(c)'s omission of any standard of review regarding arbitral legal determinations as "suggesting that the district court has plenary review over the arbitrator's findings of law." *United Retail,* 787 F.2d at 135 n. 9. In support of its conclusion, the court relied on its "settled policy of extreme deference to an arbitrator's legal as well as factual determinations," citing *United Steelworkers of America, District 36 v. Adbill Management Corp.,* 754 F.2d 138 (3d Cir.1985). *United Retail,* 787 F.2d at 135 n. 9. The court's reliance on *Adbill,* however, was misplaced. *Adbill* involved the review of a labor arbitrator's award issued pursuant to

---

5. It is true, though, as Allied points out, that the D.C. Circuit, in stating that the arbitrator's decision is "fully reviewable to determine whether applicable statutory law has correctly been applied and whether the findings comport with the evidence," incorrectly cited to § 1401(a)(3)(A) (plan sponsor's determinations presumed correct) for that proposition, and not to § 1401(c)

(rebuttable presumption that arbitrator's findings of fact were correct). *Stockton Tri Industries,* 727 F.2d at 1207–08 n. 7. But given that court's parenthetical explanation (which refers to the *arbitrator's* decision) we don't believe it misread or misunderstood ERISA, as the Trustees believe.

the parties' collective bargaining agreement. In that situation, judicial deference is "mandated by Congress' preference that this contractually agreed upon vehicle for dispute resolution be the 'final' method of adjustment among parties." *Stockton Tri Industries*, 727 F.2d at 1207 n. 7. By contrast, withdrawal liability arbitration is a statutorily required proceeding (29 U.S.C. § 1401(a)(1)), the matters of which are to be determined by Congress' intent, not the parties'. *See Teamsters Pension Trust Fund v. Allyn Transportation Co.*, 832 F.2d 502, 505 (9th Cir.1987); *see also Stockton Tri Industries*, 727 F.2d at 1207 n. 7.

Allied also contends that the extremely limited power of review provided for by the Federal Arbitration Act, 9 U.S.C. §§ 1–14, controls here. We disagree. While it is true that § 1401(b)(3) (which concerns withdrawal liability arbitration proceedings) incorporates the Federal Arbitration Act,[6] it does so only to the extent it is consistent with 29 U.S.C. §§ 1301–1461. As have the Fourth and Eighth Circuits, we hold that the limited review permitted by § 10 of the Arbitration Act (9 U.S.C. § 10) is inconsistent with § 1401(b)(2)'s broad mandate allowing courts to "enforce, vacate, or modify the arbitrator's award." *Union Asphalts*, 857 F.2d at 1234; *Republic Industries*, 718 F.2d at 641. Thus, we conclude that courts may fully review an arbitrator's legal determinations.

## C. Section 1383(a)(2)'s Interpretation.

So far as is relevant here, a complete withdrawal occurs when an employer "permanently ceases all covered operations under the plan." 29 U.S.C. § 1383(a)(2). But in spite of the clear language requiring that "all covered operations" cease before a complete withdrawal occurs, the district court held it was sufficient if "virtually all" (as opposed to "all") covered operations came to a halt in order to trigger withdrawal liability. It did so, as have other district courts,[7] by relying on a passage from the relevant legislative history. H.R.Rep. No. 896 Part I, 96th Cong., 2d Sess. 73, *reprinted in* 1980 U.S.Code Cong. & Admin. News 2918, 2941.[8] The resort to legislative

---

**6.** Actually, § 1401(b)(3) does not expressly incorporate § 10 of the Federal Arbitration Act. Section 10 lists the various grounds for which an arbitrator's award may be vacated (fraud, bias, arbitral misconduct, etc.). Section 1401(b)(3), though, does not speak of suits to vacate arbitration awards, but rather, says the Federal Arbitration Act will, to the extent it is consistent with ERISA, govern "arbitration proceedings" and the "enforce[ment]" of the arbitrator's award. Thus, § 10's limited grounds for review arguably have no application to suits to vacate withdrawal liability awards. We need not decide this issue, though, because of our holding that, even if § 10 does apply, it would be inconsistent with § 1401(b)(2).

**7.** These cases include: *Combs v. Leishman*, 691 F.Supp. 424, 430–31 (D.D.C.1988); *Connors v. Economy Building Systems, Inc.*, 651 F.Supp. 849, 853–54 (D.D.C.1986); *ILGWU National Retirement Fund v. Weatherall Fashions, Inc.*, No. 84 Civ. 9772, slip op., 1986 WL 2757 (S.D.N.Y. 1986); *F.H. Cobb Company v. New York State Teamsters Conference Pension and Retirement Fund*, 584 F.Supp. 1181, 1183 (N.D.N.Y.1984); *Speckman v. Barford Chevrolet Co.*, 535 F.Supp. 488, 491 (E.D.Mo.1982). None of these cases concluded § 1383(a)(2) was ambiguous, unclear, or would lead to absurd or unjust results if the plain language were followed before turning to the legislative history.

**8.** That passage states:
> The bill would treat an employer as withdrawing from a multiemployer plan when the employer (1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan. Current law does not define a withdrawal. As under current law, a virtually complete cessation of contributions, e.g., a 98–percent reduction, that has the same effect on the plan as a complete cessation of contributions, is a complete withdrawal.

At oral argument, the Trustees also brought to our attention a portion of the report drafted by the Senate's Labor and Human Resources Committee. But that section has to do with whether a particular withdrawal was permanent, not with whether all or only some covered operations ceased. Thus, the Report states "[a] plan sponsor need only make a reasonable determination based on the evidence available that the cessation of covered operations or obligation to contribute is not merely temporary. The Committee intends that covered operations be treated as having permanently ceased when business activity substantially ceases or when it continues but no longer gives rise to contributions to the plan." S.Rep. 1076, 96th Cong., 2d Sess. at 12, 13. Here, the question is not whether Allied's cessation of business activity was permanent or merely temporary (everyone agrees it was permanent); rather, the question is when

history was unnecessary, however, because the statute is clear and unambiguous. *See Blum v. Stenson,* 465 U.S. 886, 896, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984) (where "resolution of a question of federal law turns on a statute and the intention of Congress, we look first to the statutory language and then to the legislative history if the statutory language is unclear"). Legislative history may be consulted in rare and exceptional circumstances even when the statute is clear, or if the application of the statute's plain language produces absurd or unjust results. *Meredith v. Bowen,* 833 F.2d 650, 654 (7th Cir.1987); *Wilson v. Harris Trust & Savings Bank,* 777 F.2d 1246, 1249 (7th Cir.1985) (per curiam); *Pullman–Standard v. Interstate Commerce Commission,* 705 F.2d 875, 879 (7th Cir.1983). But where, as here, none of these factors are present, the clear language should be the guide to congressional intent. Discarding the plain language of a statute in favor of committee reports or other legislative history ignores the realities of the legislative process. The crafting of specific language often reflects legislative compromise reached after hard fought battles over the means to reach even common goals. Courts should only reluctantly turn to legislative history for fear of upsetting the delicate balance reflected in a finally worded piece of legislation.[9] *Cf. Central States Southeast and Southwest Areas Pension Fund v. Bellmont Trucking Co., Inc.,* 788 F.2d 428, 433–34 (7th Cir.1986) (quoting *Board of Governors of the Federal Reserve System v. Dimension Financial Corporation,* 474 U.S. 361, 373–74, 106 S.Ct. 681, 688, 88 L.Ed.2d 691 (1986)). In this case "the plain language" of the statute "is the best evidence of [its] meaning." *Meredith,* 833 F.2d at 654.

■ Section 1383(a)(2) says that "all covered operations" must permanently cease for a complete withdrawal to occur. 29 U.S.C. § 1383(a)(2). "It is a maxim of statutory construction that, unless otherwise defined, words should be given their ordinary, common meaning." *Ulane v. Eastern Airlines, Inc.,* 742 F.2d 1081, 1085 (7th Cir.1984), *cert. denied,* 471 U.S. 1017, 105 S.Ct. 2023, 85 L.Ed.2d 304 (1985). The common meaning of "all" is 100 percent. *Central States Southeast and Southwest Areas Pension Fund v. Bellmont Trucking Co., Inc.,* 610 F.Supp. 1505, 1510 (N.D. Ind.1985), *aff'd,* 788 F.2d 428 (7th Cir.1986). That Congress meant 100 percent when it said "all" is buttressed by the fact that in several other places, the statute qualifies "all" by using the phrase "substantially all." 29 U.S.C. §§ 1383(b)(1)(A), 1384(a)(3)(A), 1389(c), and 1405(a)(1). Plainly, Congress knew the difference between "all," "substantially all," and "virtually all"; and it opted for the unqualified "all" in 29 U.S.C. § 1383(a)(2). As we read § 1383(a)(2), then, there simply is no other way to remain faithful to Congress' intent, as expressed by the statute's clear and unambiguous language, other than to hold that all (100 percent) of the covered operations must permanently cease before finding an employer has completely withdrawn from a multiemployer plan. We therefore agree with Allied and the PBGC, and respectfully decline to follow the lead of those district courts (*see supra* n. 7) which have relied on the legislative history to reach a different result.

The Trustees argue, though, that our reading of § 1383(a)(2) may invite manipulation and abuse by scheming employers who will retain skeleton crews to avoid (delay) the imposition of withdrawal liability. We are not persuaded. First, there is no allegation of such manipulation or abuse

"all covered operations" came to a halt. The Report hardly clarifies the issue here; but even if it was consistent with the House Report, there was no need to resort to legislative history because the statute itself is clear.

**9.** Relying on legislative history, especially where, as here, the statute is clear, can produce odd results and even encourage potential abuse. "Committee reports that contradict statutory

language or purport to explicate the meaning or applicability of particular statutory provisions can short-circuit the legislative process, leading to results never approved by Congress or the President." *Wallace v. Christensen,* 802 F.2d 1539, 1560 (9th Cir.1986) (Kozinski, J., concurring); *see also Hirschey v. FERC,* 777 F.2d 1, 7–8 (D.C.Cir.1985) (Scalia, J., concurring).

on the part of Allied, so we do not face that situation here. But, more important, a remedy already exists for such a case. Under 29 U.S.C. § 1392(c), "[i]f a principal purpose of any transaction is to evade or avoid liability ... [the withdrawal liability provisions] shall be applied (and liability shall be determined and collected) without regard to such transaction." *Id.* Had Allied recalled its employees or kept them on the payroll merely to "evade or avoid liability," the Trustees could have pursued Allied under § 1392(c) regardless of the number of employees remaining or the continuation of covered operations. Thus, there is no need for us to take the drastic—indeed impermissible—step of rewriting the statute as the Trustees invite us to do.

Having interpreted § 1383(a)(2), we must now decide when Allied completely withdrew from the Plan. Allied announced in June 1982, its decision to close its Bedford Park plant. Allied and the Union negotiated a Shutdown Agreement to facilitate the closing and agreed to continue their collective bargaining agreement in effect for as long as any bargaining unit member was employed. The bargaining unit included all of Allied's production and maintenance employees engaged in the fabrication of iron, steel, metal and other products, or in maintenance work in or about the plant.

All the work performed at Allied's Bedford Park plant since June 30, 1983, was production and maintenance work within the meaning of the collective bargaining agreement,[10] and was performed by bargaining unit members. Allied's employees produced and shipped products to some of its primary customers even after June 30, 1983 (the end of the 1983 plan year). Allied also received several purchase orders after June 30, 1983. Finally, throughout this period Allied continued to contribute to the Plan as provided for by the collective bargaining agreement.

On this record, we agree with the arbitrator that the Plan's determination that Allied completely withdrew during the plan year ending June 30, 1983 (and that its withdrawal liability should be determined based on unfunded vested benefits as of June 30, 1982) was clearly erroneous. As the arbitrator found, a complete withdrawal occurred during the plan year ending June 30, 1984; thus, Allied's withdrawal liability should be based on unfunded vested benefits as of June 30, 1983.

### III.

In sum, we hold that the district court properly reviewed the arbitrator's award under the de novo standard of review. But the district court misinterpreted 29 U.S.C. § 1383(a)(2), finding a complete withdrawal occurred before all of Allied's covered operations permanently ceased. Section 1383(a)(2)'s plain language requires a finding that *all* covered operations permanently stop before a complete withdrawal occurs. Therefore, we reverse the district court and reinstate the arbitrator's award.

REVERSED.

---

**10.** The district court equated "covered operations" under 29 U.S.C. § 1383(a)(2) with what it termed "normal business operations" or with production work only. Section 1383(a)(2), however, speaks of "all covered operations under the plan," not production work. We think "covered operations" refers to those operations which are covered by the collective bargaining agreement (through the relevant bargaining unit definition) for which the employer must contribute to pension plan. *Cf. Speckman,* 535 F.Supp. at 491 (employer ceases "covered operations" if it ceases the business activity that gave rise to contributions to the plan). The business activity giving rise to contributions is the performance of bargaining unit work. Thus, the issue is whether bargaining unit work is being performed for which contributions are made, not simply whether production work is being performed. Here the Trustees stipulated that bargaining unit work was performed after June 1983.